**RECORD IMPOUNDED**

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-0512-12T1

NEW JERSEY DIVISION OF YOUTH
AND FAMILY SERVICES,

    Plaintiff-Respondent,

v.

J.S.,

    Defendant-Appellant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF A.G., a minor.

_____

| APPROVED FOR PUBLICATION |
| :---: |
| October 17, 2013 |
| APPELLATE DIVISION |

Submitted October 1, 2013  -  Decided October 17, 2013

Before Judges Messano, Sabatino, and Hayden.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Passaic County, Docket No. FG-16-08-12.

Joseph E. Krakora, Public Defender, attorney for appellant (Angelo G. Garubo, Designated Counsel, on the brief).

John J. Hoffman, Acting Attorney General, attorney for respondent (Lewis A. Scheindlin, Assistant Attorney General, of counsel; Lisa A. Puglisi, Assistant Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor A.G. (Lisa M. Black, Designated Counsel, on the brief).

The opinion of the court was delivered by

SABATINO, J.A.D.

Defendant J.S., the biological father of A.G., appeals the Family Part's August 31, 2012 order terminating his parental rights as to A.G. following a multi-day trial. Among other things, defendant argues that the trial court erred in upholding a decision of the Division of Youth and Family Services[1] (the "Division") to "rule out" two relatives who had expressed interest in serving as alternative caregivers for the child.

For the reasons that follow, we affirm the final judgment terminating defendant's parental rights. As part of our analysis, we reject defendant's argument that the Division lacked the authority to rule out relatives under N.J.S.A. 30:4C-12.1 based upon considerations of a child's best interests. Instead, we hold that the applicable statutory provisions and a related regulation, N.J.A.C. 10:120A-3.1, allow the Division to rule out a relative on such "best-interests" grounds, regardless of the relative's willingness or ability to care for a child. However, the Division's rule-out authority is always subject to the Family Part's ultimate assessment of that child's best

---

[1] A reorganization of the Department of Children and Families under L. 2012, c. 16, effective June 29, 2012, changed the name of the Division of Youth and Family Services to the Division of Child Protection and Permanency.

interests.  There is ample support in the trial record in this case to sustain the trial court's conclusion that termination of defendant's parental rights and A.G.'s continued placement with his foster parents are in A.G.'s best interests.

I.

A.G. was born in October 2009.  About eight months later, in June 2010, the Division conducted a Dodd removal[2] of him from the care of his biological mother, J.G., based upon reports that she had carelessly left him with highly intoxicated persons.  At the time of the child's removal, defendant was incarcerated in the county jail.  A.G. was immediately placed in a foster home, where he has resided ever since.

In April 2011, J.G., who had a history of substance abuse, prostitution, and a lack of stable housing, voluntarily agreed to an identified surrender of A.G. to the foster parents.[3] Hence, the issues on appeal relate solely to the child's biological father, defendant J.S.

Defendant had been diagnosed with mental health and substance abuse issues.  After he was released from jail,

---

[2] A "Dodd removal" refers to the emergency removal of a child without a court order, pursuant to the Dodd Act, N.J.S.A. 9:6-8.21 to -8.82.  N.J. Div. of Youth & Family Servs. v. P.W.R., 205 N.J. 17, 26 n.11 (2011).

[3] J.G. did not appear at the guardianship trial and has not appealed the termination of her own parental rights.

defendant tested positive for cocaine. He was referred for substance abuse treatment, but had difficulty maintaining a drug-free life, as evidenced by the fact that he tested positive for cocaine four times between February and April 2012 while on probation.

Defendant initially identified from jail four relatives as potential alternative caretakers for A.G. After those four initial candidates were ruled out within a month by the Division — decisions that defendant does not contest on this appeal — two other relatives were suggested as alternative caretakers.

First, in October 2010, defendant proposed M.R., his second cousin, as a potential caretaker. Within a month, the Division contacted M.R., had her complete necessary paperwork, and arranged visitations for M.R. with the child from October 2010 through April 2011. The Division's investigation of M.R. was complicated by the fact that she had apparent psychological problems and limited space in her home, and also by initial difficulties in getting fingerprints from another adult who lived in her home. Ultimately, the Division ruled out M.R. as a caretaker based upon its assessment of A.G.'s best interests.

In May 2011, seven months after M.R. was identified, J.P., a first cousin of defendant, contacted the Division and expressed interest in caring for A.G. By that time, J.P. had

already begun visiting A.G. weekly, at defendant's request, starting in April 2011. The Division investigated her as well, but the investigation revealed that J.P. was disabled and had four children living in her home, two of whom were also disabled. Upon considering her circumstances, the Division also ruled out J.P., on a best-interests basis. In the meantime, defendant continued to present an inability to care for his son, who was doing well with the foster parents.

The trial court entered a permanency order on June 2, 2011, approving the Division's plan to terminate defendant's rights and to proceed with the adoption of A.G. by his foster parents. The Division accordingly filed a guardianship complaint against defendant seeking the termination of his parental rights.

Later that month, on June 22, 2011, the Division sent letters separately to M.R. and J.P., advising them that they had been ruled out as potential caretakers based, in both instances, upon the Division's assessment of the child's best interests. J.P. attempted an administrative appeal within the Division of the rule-out determination as to her. However, the Division declined to review her appeal administratively, in accordance with N.J.A.C. 10:120A-3.1, which prescribes that there is no right to an administrative appeal of such a "best interest" decision. The trial court denied her request, in anticipation

that the rule-out issues would be addressed as part of the Family Part's application of the third prong of N.J.S.A. 30:4C-15.1(a), and also in recognition that defendant and the Law Guardian were participating in the case and would have the opportunity to advocate for an alternate placement with J.P. if appropriate.

In September 2011, Robert Kanen, Psy.D., an expert that the Division retained, conducted a bonding evaluation between A.G. and his foster parents. Dr. Kanen concluded in his report that A.G. "is strongly attached to the foster parents and would suffer serious and enduring harm if removed from them." Such a removal, Dr. Kanen opined, "would take the form of regression in the developmental gains [A.G.] has experienced" and "also would severely impair his sense of trust in human relationships." During his subsequent cross-examination at trial, Dr. Kanen was emphatic that removing A.G. from his foster family would cause harm, no matter where he was placed.

In January 2012, Dr. Kanen performed a psychological evaluation of defendant. That evaluation revealed that defendant has a history of mental illness, which has resulted in numerous psychiatric hospitalizations. Additionally, Dr. Kanen noted that defendant has a long history of substance abuse and antisocial behavior. According to Dr. Kanen, defendant has

significant cognitive limitations which "seriously impair his ability to supervise, protect, and care for a child."  Dr. Kanen concluded in his report that defendant's "problems are so severe that they are unlikely to ever be resolved to the point where he could independently care for himself and a child."  The  expert also opined that returning A.G. to defendant's care "would expose the child to an unnecessary risk of harm."

The guardianship trial was held over eight intermittent days between May and July 2012.  The Division presented testimony from Dr. Kanen, two caseworkers, and an adoption supervisor.  It also relied upon extensive records that were admitted into evidence without objection, except as to defendant's criminal history, by defense counsel.  Defendant did not testify, nor did he present a competing expert to counter Dr. Kanen's opinions.  He did, however, present testimony from M.R. and J.P., both of whom reiterated their respective desires to care for A.G.

After considering these proofs, the trial judge issued a detailed oral opinion on August 31, 2012, concluding that the Division had proven, by clear and convincing evidence, all four prongs of the statutory factors for termination under N.J.S.A. 30:4C-15.1(a).  This appeal by defendant followed, which is opposed by the Division as well as the Law Guardian.

A-0512-12T1

We begin our review of these issues with a recognition that the termination of a parent's right to raise his or her child is a matter of constitutional magnitude. See In re Guardianship of K.H.O., 161 N.J. 337, 346 (1999); see also N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 447 (2012). To be sure, "[p]arents have a fundamental constitutional right to enjoy a relationship with and raise their children." N.J. Div. of Youth & Family Servs. v. F.H., 389 N.J. Super. 576, 608 (App. Div. 2007), certif. denied, 192 N.J. 68 (2007) (citing K.H.O., supra, 161 N.J. at 346-47). However, this constitutional right is "tempered by the State's parens patriae responsibility to protect the welfare of children." In re Guardianship of J.N.H., 172 N.J. 440, 471 (2002).

It is well established that when seeking the termination of a parent's rights under N.J.S.A. 30:4C-15.1(a), the Division has the burden of establishing, by clear and convincing proof, the following elements:

> (1) The child's safety, health or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that

separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;

(3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

[N.J.S.A. 30:4C-15.1(a); see also N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 604-11 (1986) (reciting the four controlling standards later codified in Title 30).]

In the present appeal, defendant only challenges the trial court's findings with respect to the third and fourth prongs of the statute, and does not contest the court's adverse findings on the first two prongs. We thus confine our analysis to the two latter prongs, although we note parenthetically our recognition that the first two prongs were amply proven by the Division, given defendant's long-standing chronic deficits and his patent inability to care for A.G. himself.

Our scope of review is limited. "On appeal, a reviewing court must determine whether a trial court's decision in respect of termination of parental rights was based on clear and convincing evidence supported by the record before the court." N.J. Div. of Youth & Family Servs. v. P.P., 180 N.J. 494, 511

(2004). The trial court's factual findings "should not be disturbed unless they are so wholly unsupportable as to result in a denial of justice." J.N.H., supra, 172 N.J. at 472 (citations omitted).

A.

1.

Defendant's main argument on appeal concerning the third termination prong is that the Division violated a related statutory provision, N.J.S.A. 30:4C-12.1,[4] because it

---

[4] N.J.S.A. 30:4C-12.1 provides as follows:

> a. In any case in which the Department of Children and Families accepts a child in its care or custody, including placement, the department shall initiate a search for relatives who may be willing and able to provide the care and support required by the child. The search shall be initiated within 30 days of the department's acceptance of the child in its care or custody. The search will be completed when all sources contacted have either responded to the inquiry or failed to respond within 45 days. The department shall complete an assessment of each interested relative's ability to provide the care and support, including placement, required by the child.

> b. If the department determines that the relative is unwilling or unable to assume the care of the child, the department shall not be required to re-evaluate the relative. The department shall inform the relative in writing of:

(continued)

10

unreasonably decided not to place A.G. with either of defendant's cousins, M.R. or J.P. As we have already noted, M.R. and J.P. were respectively brought to the Division's attention in October 2010 and May 2011, after the Division had already sent rule-out letters to the first four relatives that defendant proposed. When the Division formally ruled out both M.R. and J.P. in June 2012, it rested its decisions on the best interests of the child. Defendant maintains that the Division did not adequately investigate M.R. and J.P., as called for

---

(continued)

> (1) the reasons for the department's determination;
>
> (2) the responsibility of the relative to inform the department if there is a change in the circumstances upon which the determination was made;
>
> (3) the possibility that termination of parental rights may occur if the child remains in resource family care for more than six months; and
>
> (4) the right to seek review by the department of such determination.
>
> c. The department may decide to pursue the termination of parental rights <u>if the department determines that termination of parental rights is in the child's best interests</u>.
>
> [(Emphasis added).]

under N.J.S.A. 30:4C-12.1(a). That alleged failure, defendant argues, signifies that the Division failed to adequately consider alternatives to termination, as required by the third statutory prong for termination. N.J.S.A. 30:4C-15.1(a)(3) (requiring the court to consider "alternatives to termination of parental rights").

Defendant raises two separate, but related, points on his claim of the allegedly improper rule-outs. First, he argues that M.R. and J.P. "were never fully evaluated by the Division." Second, he makes a broader challenge to the Division's construction of N.J.S.A. 30:4C-12.1(c), which the Division has interpreted to allow it to rule out relatives based solely on its assessment of the best interests of the child involved.

As this court has previously observed, N.J.S.A. 30:4C-12.1 "does not permit the Division to embark on a course set for termination of parental rights and adoption by a foster parent without at least first exploring available relative placements." N.J. Div. of Youth & Family Servs. v. K.L.W., 419 N.J. Super. 568, 580 (App. Div. 2011). An important objective of the statutory scheme is "prompt identification of relatives and notice to them of the results of the investigation and the potential for termination if the child remains in foster care." Ibid. "So understood, the Division's compliance with N.J.S.A.

30:4C-12.1 is not in any way inconsistent with the goal of permanency." Ibid. "Delay of permanency or reversal of termination based on the Division's noncompliance with its statutory obligations is warranted only when it is in the best interests of the child." Id. at 581 (citing N.J. Div. of Youth & Family Servs. v. M.F., 357 N.J. Super. 515, 527 (App. Div. 2003)).

That said, although the Division has a statutory duty to evaluate relatives as potential caretakers, there is no presumption favoring the placement of a child with such relatives. As we have explained, "although there are statutory provisions in Title 30 and Title 9 which refer to relative placements, the statutes do not create a presumption in favor of such placement." M.F., supra, 357 N.J. Super. at 528-29. Rather, "[a] presumption of custody only exists in favor of a natural parent as opposed to placement with relatives or foster parents." Id. at 528 n.3 (citing Watkins v. Nelson, 163 N.J. 235, 246 (2000)).

Here, in finding that the Division did, in fact, comply with N.J.S.A. 30:4C-12.1, and also, therefore, N.J.S.A. 30:4C-15.1(a)(3), the trial court reasoned:

> No viable alternatives to termination of parental rights have been presented to the [c]ourt. [Defendant] has proposed that a relative could take custody of [A.G.] for

a period of time during which he will overcome the barriers he faces to safely parent the child.

. . . .

<u>This [c]ourt concurs with the Division in its assessment that each relative was properly ruled out from custody and that [defendant's] proposed alternative[s] to placement [are] therefore impractical</u>.

Furthermore, a simple suggestion by the defendant that someone might be interested in caring for his child is very different from contacting that person himself, securing his or her cooperation and making any and all necessary arrangements for the child's care.

The defendant's reliance on [<u>K.L.W.</u>, <u>supra</u>, 419 <u>N.J. Super.</u> at 568] is misplaced. This [c]ourt cannot ignore that the Division did, in fact, contact all relatives named by [defendant]. Some of these relatives declined or were not approved for various and legitimate reasons, such as the prior history or living arrangements of the person in question.

Additionally, the child in <u>K.L.W.</u> had siblings already in that relative's home and in that case there was expert testimony that the harm could be mitigated.

I find that the Division has carried its burden by proving by clear and convincing evidence as to [p]rong [three] under <u>N.J.S.A.</u> 30:4C-15.1(a)(3).

[(Emphasis added).]

Subsection (a) of <u>N.J.S.A.</u> 30:4C-12.1 instructs the Division to initiate a search of relatives and to complete an

14

assessment of each interested relative's ability to care for the child.  Subsection (b) sets forth the Division's duty to inform the prospective relative if the Division determines "that the relative is unwilling or unable to assume the care of the child[.]"  <u>N.J.S.A.</u> 30:4C-12.1(b).  Principally at issue here is subsection (c), which states that "the [Division] may decide to pursue the termination of parental rights if [it] determines that termination of parental rights is in the child's <u>best interests</u>."  <u>N.J.S.A.</u> 30:4C-12.1(c) (emphasis added).

Although the Division's brief does not explicitly reference subsection (c), it appears that the Division commonly interprets that section as granting it the authority to rule out relatives based on the Division's assessment that placement with that relative would not be in the child's best interests.  That interpretation is also evidenced by the Division regulation, <u>N.J.A.C.</u> 10:120A-3.1(b),[5] which provides that a relative does not

---

[5] <u>N.J.A.C.</u> 10:120A-3.1(b) reads in full:

> A relative does not have a right to appeal, as a status issue, a Division action that it is not in a child's best interest to be placed with a relative.  A relative can appeal a Division action that the relative is either unwilling or unable to care for a child.

have the right to pursue an administrative appeal of a rule-out decision predicated solely upon a best-interests assessment.[6]

Defendant essentially argues that the Division's statutory interpretation improperly relieves it of its duty to prove each of the best-interests prongs by clear and convincing evidence, because it allegedly takes the question of the child's best interests — or at least this aspect of it — out of a trial judge's hands. In defendant's view, the Division "must present the court with complete information" so that the court, and not the Division, can determine what is in the child's best interests.

The Division took into account a similar concern raised by Legal Services of New Jersey ("LSNJ") when promulgating N.J.A.C. 10:120A-3.1(b). The Division described LSNJ's comment to the proposed regulation in the New Jersey Register as follows:

> LSNJ recommends that the Division delete the proposed amendment to N.J.A.C. 10:120A-3.1(b). Best interest determinations regarding a child's placement are not made unilaterally by the Division, but by the Superior Court. See N.J.S.A. 9:6-8.54 and 30:4C-61.2. The litigants can and should make recommendations as to the appropriate placement but the ultimate decision is under the court's authority.

---

[6] Although defendant has not mentioned N.J.A.C. 10:120A-3.1(b) in his brief, his arguments logically implicate the validity of that regulation involving a "best interest" rule-out.

[41 N.J.R. 242(a) (Jan. 5, 2009).]

The Division responded to this comment by stating:

> N.J.S.A. 30:4C-12.1 permits the [Division] to make determinations that a relative is either unwilling or unable to care for a child. Pursuant to the statute, relatives have the right to seek review of these decisions by the [Division]. N.J.S.A. 30:4C-12.1 does not provide for a [Division] review of decisions not related to the relative's unwillingness or inability to care for a child. Placement decisions made by the Division and based on other factors, such as the relatives' location or personal relationship between the child and the relative, are not subject to administrative appeal. The Division agrees that the statutes cited by LSNJ address the [c]ourt's role in placing children.
>
> [Ibid. (emphasis added).]

The Division's interpretation and regulatory approach in implementing the "best interests" language in N.J.S.A. 30:4C-12.1(c), as manifested in the promulgation of N.J.A.C. 10:120A-3.1(b), is entitled to considerable deference. Although we certainly are not bound by the Division's construction of the law, "[i]t is settled that '[a]n administrative agency's interpretation of statutes and regulations within its implementing and enforcing responsibility is ordinarily entitled to our deference.'" Wnuck v. N.J. Div. of Motor Vehicles, 337 N.J. Super. 52, 56 (App. Div. 2001) (quoting In re Appeal by Progressive Cas. Ins. Co., 307 N.J. Super. 93, 102 (App. Div.

17

1997)); see also Waksal v. Dir., Div. of Taxation, 215 N.J. 224, 231 (2013) (noting that our courts "generally defer to the interpretation that an agency gives to a statute that agency is charged with enforcing" (internal quotation marks omitted)). Moreover, a "strong presumption of reasonableness must be accorded [to an] agency's exercise of its statutorily delegated duties." In re Certificate of Need Granted to the Harborage, 300 N.J. Super. 363, 380 (App. Div. 1997).

We are persuaded that the Division's interpretation of the "best interests" language of N.J.S.A. 30:4C-12.1 comports with the intended meaning of the statute and the overall statutory scheme for the termination of parental rights. If, as defendant argues, a non-parental relative could be ruled out only in instances where he or she is unwilling or unable to care for the child, then N.J.S.A. 30:4C-12.1 would essentially be creating a statutory presumption in favor of placing children with competent and willing relatives. Such a presumption would be in contravention to this State's case law interpreting Title 30. The reality is that, no matter how fit or willing a proposed relative may be, a child will, in some instances, be better off remaining in a successful foster placement.

The satisfaction of the rule-out criteria in N.J.S.A. 30:4C-12.1 is, in essence, just one element of the requirements

imposed by N.J.S.A. 30:4C-15.1(a)'s four-prong "best interests" test. Allowing the Division to make an assessment of the child's best interests in the rule-out context of N.J.S.A. 30:4C-12.1(c) does not relieve the Division of its duty to prove at a guardianship trial all four prongs of N.J.S.A. 30:4C-15.1(a). The burden still remains on the Division to defend its determinations, as it must prove to a Family Part judge by clear and convincing evidence that it "made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights." N.J.S.A. 30:4C-15.1(a)(3). We therefore perceive no dissonance between the Division's ability to rule out a relative as a caretaker purely on a "best interests" assessment under N.J.S.A. 30:4C-12.1, and the overarching four-pronged statutory test of termination under N.J.S.A. 30:4C-15.1(a).

As a practical matter, allowing a relative who had been ruled out as a caretaker on best-interests grounds to pursue an administrative appeal of that decision through the dispositional hearing process of N.J.A.C. 10:120A-3.2 (and possibly an appeal thereafter to this court, pursuant to N.J.A.C. 10:120A-2.8 and Rule 2:2-3) could readily interfere with the Family Part's ongoing jurisdiction over the related guardianship case. The

best-interests issues and evidence in the administrative matter will undoubtedly overlap with the disputed issues and evidence before the Family Part in the guardianship action.  There is no sensible reason to allow those same best-interests questions to be litigated twice — once in an administrative forum and once in a judicial forum.[7]

We do not construe the statutory and regulatory schemes to permit the risk of inconsistent adjudicated outcomes in an administrative appeal and the separate guardianship proceedings in the Family Part.  That may present a situation that could inject more uncertainty and delay into the future path of a child needing permanency.  The Division can defend its best-interests rule-out of a relative in the fuller context of the guardianship case.  In that case, the Family Part judge will have the benefit of a fuller record of testimony and exhibits. The judge also will have the benefit of the advocacy of the child's parent or parents, and the Law Guardian, who presumably would not otherwise be parties to the relative's administrative appeal.

---

[7] We contrast that with a situation in which the Division has ruled out a potential caretaker for cause on narrow grounds, e.g., an apparent criminal record, where the administrative hearing would be focused on that narrow issue.

In sum, we concur with the Division that a relative has no right to pursue an administrative appeal of a rule-out decision in instances when that decision is predicated upon a best-interests assessment, rather than a finding that the relative is unfit or unwilling. The regulation that the Division has adopted expressing that prohibition, <u>N.J.A.C.</u> 10:120A-3.1, is valid. The regulation is not at odds with the overall statutory scheme or its objectives, with the important caveat that the court, not the Division, is the ultimate arbiter of the child's best interests.

Lest our opinion be misunderstood, we emphasize that we do not construe the Division's authority to reject a relative on "best interests" grounds under subsection (c) of <u>N.J.S.A.</u> 30:4C-12.1 to relieve it of its responsibility under subsection (a) of that statute requiring it to conduct a fair investigation of such a relative who identifies himself or herself as a potential caretaker in a reasonably prompt manner. The Division cannot ignore such a relative's timely application out of bureaucratic inertia, or consider that application based upon an arbitrary, preordained preference for the foster placement. The Division must perform a reasonable investigation of such relatives that is fair, but also sensitive to the passage of time and the child's critical need for finality and permanency.

A-0512-12T1

If, hypothetically, the Division has been lax or capricious in its assessment of such timely-presented alternative caretakers, it bears the litigation risk that a Family Part judge will conclude, under N.J.S.A. 30:4C-15.1(a)(3), that it has failed to prove by clear and convincing evidence that "alternatives to termination of parental rights" have been appropriately considered. See also K.L.W., supra, 419 N.J. Super. at 582 (noting that the Division's statutory obligation "does not permit willful blindness and inexplicable delay in assessing" a relative).[8] In the present case, however, we discern no such abuse of the Division's investigative or decision-making authority.

Apart from the correctness of the Division's legal construction of the best-interests language in the rule-out statute, there are compelling, fact-specific reasons in the present case for upholding its rule-outs of M.R. and J.P.[9]

---

[8] Although this judicial assessment will normally be made conclusively after a guardianship trial, our opinion does not foreclose the Family Part judge from making an earlier inquiry into the merits of the Division's administrative rule-out of a relative, as part of the court's ongoing oversight of the family. If such inquiry reveals that the Division has ruled out a potential caretaker arbitrarily or prematurely, the judge can take that into account in making decisions about the child during the course of litigation.

[9] We note that neither M.R. nor J.P. has moved to intervene in this appeal. We therefore need not address whether the court

(continued)

A.G. has been with his foster family since June 2010. According to the Division's unrebutted expert witness, Dr. Kanen, the child has developed a strong and secure attachment to his foster parents. Aside from a limited number of visitations at which M.R. and J.P. were present, A.G. has no long-standing relationship with these distant relatives. Given that there is no legal presumption in favor of a child's placement with relatives, and that defendant has not progressed closer to becoming an able parent, there is no realistic basis to perceive that placement with M.R. or J.P. would be in A.G.'s best interests. This is especially true in light of this State's "strong public policy in favor of permanency." K.H.O., supra, 161 N.J. at 357; see also N.J.S.A. 30:4C-11.3 (stating that "the child's need for permanency shall be of paramount concern to the court").

The record suggests that M.R., although she was not specifically ruled out for cause, had numerous constraints that might make a placement with her problematic, including some

(continued)
erred in denying J.P.'s request to intervene in the guardianship proceeding, although we envision that such participation could have presented complications.

23                                                A-0512-12T1

psychiatric issues and space limitations.[10]  M.R. had no apparent pre-existing relationship with A.G. prior to October 2010, and her visits with A.G. ended in April 2011.

J.P., meanwhile, was herself disabled, and was already caring for four children, two of whom had special needs.  J.P. did not come forward until the child had already been in foster care for ten months.  Where a child has been in a positive foster home environment for a prolonged period, the Division should have the ability to rule out proposed relatives after an unreasonable delay.  See K.L.W., supra, 419 N.J. Super. at 580

_____

[10]  With respect to M.R., a second cousin, we also note the Division's limited definition of "relative."  N.J.S.A. 30:4C-12.1 imposes a duty on the Division to search for "relatives," but does not contain a definition for that term.  See N.J.S.A. 30:4C-2 (defining relevant terms in Title 30).  The Department of Human Services regulations, however, define "relative" as a

> birth or adoptive brother, sister, stepparent, stepbrother, stepsister, uncle, aunt, first cousin, niece, nephew, as well as relatives of half blood or marriage and those denoted by the prefixes "grand" and "great," including grandparent or great-grandparent, and limited to those having a history of being active in planning for the child's future.
>
> [N.J.A.C. 10:120A-1.3 (emphasis added).]

According to M.R.'s testimony, she and defendant were only second cousins.  Hence, M.R. was not a "relative" that the Division was obligated to investigate under the applicable regulations, although it did so anyway.

(noting that the "plain meaning and purpose" of <u>N.J.S.A.</u> 30:4C-12.1 "is <u>prompt identification of relatives</u>" (emphasis added)). In addition, J.P., like M.R., had no evident prior relationship with the child.[11]

2.

With respect to the other facet of the third statutory prong for termination, defendant argues that the Division's efforts to provide him with services were deficient in several respects. His primary argument is that the Division should have placed him in an inpatient drug treatment program. He also

---

[11] Although it does not affect our statutory analysis under prong three, we do agree with defendant that the Division should have advised M.R. sooner than the June 2011 rule-out letter informing her that she had been rejected as a potential caretaker. A contact sheet in the Division's records dated December 10, 2010 noted that the case was on a "fast track to adoption" and that a rule-out letter to M.R. was one of the multiple tasks left to perform. If, as the contact sheet suggests, the Division knew in December 2010 that it was going to rule out M.R., it should have informed her of that decision much sooner than June 2011, when it sent the rule-out letter to her. It was, at the very least, discourteous to M.R. to keep her in the dark for six additional months. The Division attempts to justify that delay because it apparently wanted to ensure that the placement with the foster parents would continue to be successful. However, that excuse is unpersuasive since nothing would have prevented the Division (and, for that matter, the trial court) from reviving M.R.'s application at a later point if she were still interested. While there is no fixed deadline in <u>N.J.S.A.</u> 30:4C-12.1 for the issuance of rule-out letters, and a late rule-out letter does not affect the Division's satisfaction of prong three of the termination criteria, we urge the Division to act with reasonable diligence in notifying a potential caretaker that he or she has been ruled out, assuming that the investigation has been completed.

argues that the Division failed to provide him with sufficient visitation. In this regard, defendant emphasizes his consistent attendance at visitations and the positive reports about his interactions with A.G. The trial court rejected defendant's criticisms of the many services that the Division provided to him, and so do we.

We recognize that the Division is required, pursuant to N.J.S.A. 30:4C-15.1(a)(3) and -15.1(c), to make "reasonable efforts" to "assist the parents in remedying the circumstances and conditions that led to the placement of the child and in reinforcing the family structure." (Emphasis added). The reasonableness of those efforts is "not measured by their success." In re Guardianship of D.M.H., 161 N.J. 365, 393 (1999). Rather, "[t]hese efforts must be assessed against the standard of adequacy in light of all the circumstances of a given case. Consistent efforts to maintain and support the parent-child bond are central to the court's determination." Ibid.

In ruling here that the Division had proven this aspect of the third prong by clear and convincing evidence, the trial judge observed:

> This [c]ourt is satisfied that the Division has taken reasonable efforts. The Division has provided [defendant] with parenting instruction, supervised

visitation, substance abuse assessment, substance abuse treatment, mental health treatment, and access to public transportation. It has coordinated with service providers and has met regularly with [defendant].

Had [defendant] fully availed himself of the Division's efforts, it is the [c]ourt's opinion that he would have had the opportunity to correct the circumstances which led to [A.G.'s] placement with his resource parents.

The judge also specifically rejected defendant's argument that the Division failed to meet its services obligations because defendant was never enrolled in court-ordered inpatient drug treatment. In reaching this conclusion, the judge reasoned:

This [c]ourt finds this claim to be without merit. [The Division was ordered to] provide [defendant] with inpatient treatment on [June 2, 2011]. The Division made several attempts to enroll [defendant] in different programs, but none would accept him because he did not test positive for narcotics. During this time he simply refused to provide a urine sample. It is apparent to this [c]ourt that [defendant] was aware of the prerequisite to admission of testing positive and intentionally did not provide a urine sample in order to avoid going to inpatient treatment.

[Defendant's] failure to enroll was entirely the product of his own plan and does not reflect a lack of reasonable efforts on the part of the Division. When he was enrolled in some of the programs his attendance was extremely poor and, as stated

27

> many times prior to this, he acted out in an aggressive manner.

> Lastly, any claims by the defense that the Division failed to find a program are disingenuous as [defendant] is currently attending an outpatient program through his placement . . . as he is on probation a[t] the current time.

[(Emphasis added).]

The judge's observations are adequately supported by substantial, credible evidence in the record. Defendant contends that there was no direct evidence at trial that he ever refused to provide a drug screen. However, there is evidence from both the testimony of a caseworker, Anna Cebula, and a December 13, 2010 clinical summary from Options, a program provider, indicating defendant's failure to attend treatment, at which time his urine would presumably have been tested for drugs. The court made a reasonable inference that defendant was attempting to evade detection by his non-attendance at the treatment sessions. In any event, even assuming for the sake of argument that such an inference was mistaken, there is ample other proof in the record to support a finding of an overall reasonable effort to provide him with services.

In addition, defendant's criticisms of the visitation provided to him ring particularly hollow, as the record shows that the Division provided him with the opportunity for regular

weekly visits with A.G.  There is no expert proof that such visitation opportunities were insufficient.  In sum, the services aspect of the third prong was amply met.

B.

We lastly turn to the fourth prong of the statute, and the question of whether termination of defendant's parental rights would do A.G. more harm than good.  As our case law has noted, this fourth prong is especially important to a termination analysis.  The fourth prong functions as a "fail-safe" to guard against the unwise termination of a defendant's parental rights. N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 609 (2007).  One of the critical aspects of the analysis under the fourth prong is the "paramount need the children have for permanent and defined parent-child relationships." In re Guardianship of J.C., 129 N.J. 1, 26 (1992); see also N.J.S.A. 30:4C-11.3.

In addressing this fourth prong, the trial judge provided the following detailed analysis:

> Termination of [defendant's] parental rights as to [A.G.] will not do more harm than good.  It is the opinion of this [c]ourt that the termination of [defendant's] relationship with [A.G.] will have minimal, if any, adverse effect on the child.
>
> In contrast, there is ample reason to believe that severing the ties between [A.G.] and his resource parents would cause

harm to the child and undo much of the progress he has made in their care.

Dr. Kanen performed a bonding evaluation on March 2, 2012 with [A.G.], [defendant], and [A.G.'s] resource parents. [A.G.] went into distress when taken from his resource parents and brought to [defendant]. He had difficulty separating from his resource parents and took 35 minutes to speak.

[A.G.] referred to [defendant] . . . by his first name and his resource parents as mommy and daddy. When [defendant] left the room [A.G.] was not concerned. Dr. Kanen interpreted these observations to mean that [A.G.] does not see [defendant] as a parental figure and perceives his resource parents as his parents. Thus, the result of the bonding evaluation strongly suggests that [A.G.] would be negatively affected if he were to be separated from his resource parents and minimally affected if denied contact with [defendant].

[A.G.] exhibited developmental delays including difficulties with speech when he was first placed with his resource parents at age eight months. Dr. Kanen testified that [A.G.] has made significant improvements over time and that there was a high risk of losing developmental progress if [A.G.] were to be removed from his foster home.

Dr. Kanen further testified that [A.G.] would be very traumatized and at risk for depression if separated from his resource parents. He has grown and more importantly thrived under the care of his foster parents. He regards this couple as his parents.

A-0512-12T1

It is highly unlikely that . . . [defendant] will be able to care for the child in the near future.

As discussed, the prognosis for [defendant's] improvement is very poor as per the expert testimony of Dr. Kanen. He struggles to even care for himself. Dr. Kanen testified that his problems are chronic and unlikely to change. He has not maintained stable housing nor obtained employment.

Further, his proposed path toward normalizing his parental relationship involves his cousin taking physical custody of [A.G.] for an indeterminate period of time. And I must stress that there is a need for permanency and consistency.

We cannot add more to these sound insights by the fact-finder. Defendant asserts that Dr. Kanen's expert opinion, upon which the judge relied, was skewed and failed to sufficiently take into account defendant's positive interactions with A.G. during visitations. We reject that criticism, as the record shows that Dr. Kanen performed a sufficiently thorough assessment of the child's bonding with both defendant and the foster parents.

We do not believe Dr. Kanen was unfair or that he overlooked critical information. Since he observed defendant interact with A.G. first-hand in the bonding evaluation, it was not vital for Dr. Kanen to review the written reports of defendant's visits. Nor was it vital for Dr. Kanen to interview

M.R. or J.P., with whom the child had no prior long-standing relationship.

Indeed, Dr. Kanen's assessment of the child's circumstances is essentially unassailable. It was well within the discretion of the trial court to accept the unrebutted and unequivocal opinion of the Division's expert. Brown v. Brown, 348 N.J. Super. 466, 478 (App. Div.) (noting that "[a] trial court is free to accept or reject the testimony of either side's expert"), certif. denied, 174 N.J. 193 (2002).

Applying our limited standard of review, J.N.H., supra, 172 N.J. at 472, to the careful judgment that the trial court fairly exercised in weighing the fact-sensitive considerations here under the fourth prong, we affirm the court's determination.

### III.

The final judgment terminating defendant's parental rights as to A.G. is consequently affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION