# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-5613-16T2
              A-5614-16T2

NEW JERSEY DIVISION OF
CHILD PROTECTION AND
PERMANENCY,

      Plaintiff-Respondent,

v.

B.R. and C.Q.,

      Defendants-Appellants.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF C.Q.
and C.R.,

      Minors.

_____

Submitted November 27, 2018 – Decided December 14, 2018

Before Judges Rothstadt, Gilson and Natali.

On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Bergen County, Docket No. FG-02-0061-16.

Joseph E. Krakora, Public Defender, attorney for appellant B.R. (Sarah L. Monaghan, Designated Counsel, on the briefs).

Joseph E. Krakora, Public Defender, attorney for appellant C.Q. (John A. Salois, Designated Counsel, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Jason W. Rockwell, Assistant Attorney General, of counsel; Eric J. Boden, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minors (Meredith A. Pollock, Deputy Public Defender, of counsel; Margo E.K. Hirsch, Designated Counsel, on the brief).

PER CURIAM

In this appeal, C.Q. (Carter)[1] contests the Family Part's August 7, 2017 final judgment of guardianship terminating his parental rights to C.D.Q. (Cade) and C.R. (Cody).[2] Defendant argues that the Division of Child Protection and

---

[1] We use fictitious names to protect the privacy of the parties and children.

[2] The children's mother, B.R. (Brenda), also appealed from the court's August 7, 2017 order terminating her parental rights to Cade and Cody. We have been advised by her counsel that Brenda died during the pendency of the appeal and, accordingly, we dismiss her appeal as moot. We nevertheless address in the context of Carter's appeal those issues Brenda raised affecting the best interests of Cade and Cody, including the Division's alleged failure to consider alternatives to termination as required by N.J.S.A. 30:4C-15.1(a)(3), or to place the children together or with relatives, in violation of the Child's Placement Bill of Rights Act, N.J.S.A. 9:6B-1 to -6 (CPBRA).

2

Permanency (Division) did not prove all four prongs of the statutory "best interests of the child" test under N.J.S.A. 30:4C-15.1(a) by clear and convincing evidence. The Law Guardian supports termination and urges us to affirm the trial court's determination. After a thorough review of the record, we affirm the order terminating Carter's parental rights.

I.

The Division first became involved with defendants in November 2010 when it substantiated a report of neglect against Brenda and Carter concerning Carter's son from a different relationship, who witnessed a domestic violence incident between defendants during a visit to Carter's home, while Carter and Brenda were drinking alcohol and using cocaine. On November 12, 2013, Brenda gave birth to Cade. Approximately seven months later, on June 26, 2014, the Division received reports of domestic violence, with Carter the alleged perpetrator and Brenda the alleged victim. The Division investigated and determined that the allegation of abuse or neglect of Cade was not established. Nevertheless, the Division kept the case open for services due to concerns over the parent's history of substance abuse and domestic violence, and Brenda's possible mental health issues.

A-5613-16T2

On July 5, 2014, just nine days later, the Division received a new referral, alleging Brenda's inadequate supervision of Cade. Although the Division ultimately determined the referral was unsubstantiated, during its investigation, the Division learned that Brenda had taken Cade to Florida and had been arrested for assaulting Carter in the child's presence. Defendants later became embroiled in a custody dispute, which resulted in Cade's placement in Carter's sole custody and with the Division implementing a safety plan under which Brenda was permitted supervised visitation.

On August 12, 2014, Carter participated in a psychological evaluation with Dr. Alison Winston. Dr. Winston recommended that Carter complete domestic violence counseling, psychotherapy, parenting classes and a substance abuse evaluation. On October 24, 2014, Carter also participated in a psychiatric evaluation with Dr. Larry Dumont. He similarly recommended that Carter attend domestic violence counseling and also stated that he should participate in Narcotics Anonymous/Alcoholics Anonymous, parenting skills training, and random alcohol screens.

While investigating additional referrals made on October 29, 2014, and November 7, 2014, involving the family, the Division learned that Carter had been arrested on November 13, 2014, for possession of cocaine with intent to

distribute. These illegal activities occurred in the home in which he resided with Cade. As a result of his arrest, the Division substantiated Carter for neglect, removed Cade on an emergent basis, and placed him in a non-relative resource home. Thereafter, the Division instituted abuse and neglect proceedings and the court entered an order granting the Division custody of Cade.

Carter continued to struggle with substance abuse issues and tested positive numerous times for both cocaine and opiates. As a result, the Division referred Carter for a substance abuse assessment, which recommended he attend intensive outpatient treatment.

Carter began outpatient substance abuse treatment on January 29, 2015, and he tested positive for opiates at intake. Carter then enrolled in an outpatient substance abuse program at Clifton Counseling. On May 29, 2015, Clifton Counseling advised the Division that a test of Carter's hair and urine was positive for opiates and cocaine. On the same day, Cater was arrested on additional drug charges and remained incarcerated until June 2015.

Although Carter ultimately completed substance abuse counseling at Clifton Counseling, he again tested positive for cocaine in a random drug test in December 2015. Carter attended a new substance abuse evaluation and was

diagnosed with moderate cocaine use disorder and mild opioid use disorder and was again referred to outpatient treatment.

On October 2, 2015, Brenda gave birth to Cody in Baltimore, Maryland. Because Cody tested positive for opiates and received treatment for withdrawal symptoms, the hospital contacted the Division. The court thereafter granted the Division's request for custody of Cody, and added him to the pending abuse and neglect proceedings related to Cade.

On November 12, 2015, after his discharge, the Division transported Cody to New Jersey, and placed him in a non-relative resource home. At the time of Cody's placement, Cade had been residing with a paternal uncle. The paternal uncle advised the Division that he could not care for both Cody and Cade. As a result, Cody continued to reside with the same resource parents through the time of trial, who expressed a desire to adopt him.

In April 2016, the court approved the Division's permanency plan of termination of defendants' parental rights. The Division filed a guardianship complaint shortly thereafter.

Also in April 2016, the Division moved Cade back to a non-relative resource placement with J.A. (Jane) with whom he was briefly placed, after his paternal uncle relocated to the Dominican Republic for employment-related

reasons. Jane expressed a desire to adopt Cade, and also requested that Cody live with her once she obtained a larger apartment. At the time, however, Jane's home was not large enough for both children, and she did not become licensed for two children until October 2016.

On June 27, 2016, Carter was sentenced, after pleading guilty on two separate indictments, to a total of ten years in prison, with a parole eligibility date of June 2019. He is currently residing in a halfway house in Newark. During his incarceration, the Division facilitated monthly visits with Cade and Cody. The children also visited with each other, their paternal aunt and grandmothers.

During the years of its involvement with the family, the Division considered several relative placements for the children. In addition to the six months when Cade was placed with his paternal uncle, the Division considered the children's paternal grandmother as a potential placement. However, she declined, citing her age. The Division issued her rule-out letters in January 2015 and June 2015, and she did not contest the Division's decision. In addition, in January 2015, the Division ruled out placing Cade with his paternal aunt due to a safety issue with her apartment. In August 2016, the paternal aunt asked to be reconsidered as a placement. However, she changed her mind due to her

husband's opposition. The Division issued her a second rule-out letter on April 21, 2017, which she did not contest.

In September and October 2016, while incarcerated, Carter stated, for the first time, that he wanted the children placed with his ex-wife, L.C. (Lisa), the mother of Cade and Cody's half-siblings. Brenda opposed that plan. Despite Brenda's opposition, the Division investigated placing Cade and Cody with Lisa, and she expressed a willingness to adopt them. However, on May 22, 2017, the Division issued her a rule-out letter, stating that it was not in the best interests of the children to be placed with her.

At trial, Robert Miller, Ph.D., the Division's expert witness on forensic psychology and psychological evaluation, bonding and attachment, testified that placement with Lisa was not in the children's best interests, as she was a stranger to them, and Cade already had suffered from multiple placements. Melissa Krynicki, a Division caseworker, also testified at trial that Lisa had no relationship with the children, who were closely bonded with their resource parents. Moreover, Krynicki testified that Carter had a history of domestic violence issues with his ex-wife, which also concerned the Division.

Finally, in September 2014, after the July 2014 incident in Florida, Brenda's mother, R.B. (Randi), who resided in New York, asked that Cade be

placed with her. At that time, however, the Division did not have custody of Cade, as he was in Carter's care. The Division advised Randi that in order for Cade to be placed with her she would need to become licensed as a foster parent, and the Division would need to conduct an interstate evaluation. There is no indication in the record that Randi completed the licensing requirements or that an interstate evaluation was conducted.

Shortly before the guardianship trial, in February and March 2017, Randi requested visitation with the children. The court granted her one hour per month at the Division's offices. By order dated May 8, 2017 (the first day of trial), the court, after considering the Division's objection, denied Randi's request for additional visitation, except to the extent she could attend visits at Brenda's rehabilitation facility. On May 22, 2017, the Division issued a rule-out letter to Randi. The Division relied on Dr. Miller's bonding evaluation and concluded that placing Cade and Cody with her would be contrary to their best interests as they were bonded with their resource caregivers.

At trial, the Law Guardian advocated for the boys to be placed together with Jane, who reiterated her willingness to care for both children. It was the Division's position, however, that it was in the boys' best interests to be adopted by their separate resource parents as recommended by Dr. Miller.

9

In his detailed, seventy-nine-page written decision, Judge William R. DeLorenzo found the Division proved, by clear and convincing evidence adduced during the five-day trial, all four prongs of N.J.S.A. 30:4C-15.1(a). At trial, the Division relied upon documentary evidence and the testimony of Krynicki and Dr. Miller. The Law Guardian relied upon the testimony of Cade's resource parent, Jane, and Antonio Burr, Ph.D., an expert in clinical forensic psychology, who conducted bonding evaluations with Cade and Cody and their resource parents and a separate bonding evaluation with only the children. Dr. Burr testified that it would be in the children's best interests to be placed together with Jane. Neither parent presented any facts or expert witnesses at trial. On appeal, the Law Guardian no longer argues that Cade and Cody should be placed together but rather "supports the trial court's decision to maintain [the boys] in their respective resource homes, with continued sibling visitation, as in their best interests."

## II.

Carter appeals, arguing:

> POINT I
>
> THE DIVISION FAILED TO ESTABLISH BY CLEAR AND CONVINCING EVIDENCE THAT IT WAS NECESSARY TO TERMINATE [HIS]

PARENTAL RIGHTS IN ORDER TO PROTECT HIS CHILDREN'S BEST INTERESTS.

A. THE TRIAL COURT IMPROPERLY DETERMINED THAT THE DIVISION PROVED BY CLEAR AND CONVINCING EVIDENCE THAT CADE AND CODY'S HEALTH AND DEVELOPMENT HAD BEEN OR WILL BE ENDANGERED BY CARTER AND DCPP FAILED TO PRESENT SUBSTANTIAL, CREDIBLE EVIDENCE OF CONTINUING HARM AND CONSEQUENTLY THE JUDGMENT MUST BE REVERSED.

B. GIVEN [HIS] COMPLIANCE WITH THE DIVISION'S REQUIREMENTS FOR SERVICES, DCPP FAILED TO PRESENT SUFFICIENT EVIDENCE TO SUPPORT THE TRIAL COURT'S CONCLUSION THAT THE DIVISION SATISFIED ITS OBLIGATION TO DEMONSTRATE BY CLEAR AND CONVINCING PROOF THAT [HE] WAS UNWILLING AND UNABLE TO ELIMINATE THE HARM TO CADE AND CODY.

C. DCPP DID NOT PROVE BY CLEAR AND CONVINCING EVIDENCE THAT IT PROPERLY CONSIDERED ALTERNATIVES TO TERMINATION OF PARENTAL RIGHTS.

D. THE TRIAL COURT'S CONCLUSION THAT THE TERMINATION OF PARENTAL RIGHTS WOULD NOT DO MORE HARM THAN GOOD AND THAT CADE AND CODY WOULD SUFFER SEVER AND ENDURING HARM IF HIS PARENTAL RIGHTS WERE

11

TERMINATED IS NOT SUPPORTED BY THE
RECORD.

We find no merit in these arguments and affirm substantially for the reasons stated in Judge DeLorenzo's written opinion. We add the following comments.

Our review of the findings of fact made by a trial judge in family cases is limited. In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002). We afford deference to a trial court's findings of fact because the trial court "has the opportunity to make first-hand credibility judgments about witnesses who appear on the stand; it has a 'feel of the case' that can never be realized by a review of the cold record." N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008). When the trial court's findings of fact are supported by adequate, substantial and credible evidence, they are binding on appeal. J.N.H., 172 N.J. at 472.

Parents have a constitutionally protected right to the care, custody and control of their children. Santosky v. Kramer, 455 U.S. 745, 753 (1982); In re Guardianship of K.H.O., 161 N.J. 337, 346 (1999). "The rights to conceive and to raise one's children have been deemed 'essential,' 'basic civil rights . . . ,' and 'rights far more precious . . . than property rights.'" Stanley v. Illinois, 405 U.S. 645, 651 (1972) (citations omitted). "[T]he preservation and strengthening of

family life is a matter of public concern as being in the interests of the general welfare." N.J.S.A. 30:4C-1(a); see also K.H.O., 161 N.J. at 347.

The constitutional right to the parental relationship, however, is not absolute. N.J. Div. of Youth & Family Servs. v. R.G., 217 N.J. 527, 553 (2014); N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 599 (1986). At times, a parent's interest must yield to the State's obligation to protect children from harm. N.J. Div. of Youth & Family Servs. v. G.M.,198 N.J. 382, 397 (2009); In re Guardianship of J.C., 129 N.J. 1, 10 (1992).

To effectuate these concerns, the Legislature codified the test for determining when a parent's rights must be terminated in a child's best interests. N.J.S.A. 30:4C-15.1(a) requires that the Division prove by clear and convincing evidence the following four prongs:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;

(3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

See also A.W., 103 N.J. at 604-11.

### A.    Prong One

As for the first prong, the court found that Carter's persistent drug use, violent relationship with Brenda and his illegal activities caused the children to "languish[]" in resource care as reunification would have placed them at risk of harm. That finding was supported by the fact of Carter's incarcerations, most recently in June 2016, when the children were less than three-years old. While we acknowledge incarceration alone is insufficient to establish parental unfitness, termination of parental rights of an incarcerated parent will be upheld if supported by "particularized evidence of how a parent's incarceration affects each prong of the best-interests-of-the-child standard . . . ." R.G., 217 N.J. at 556. Here, the judge's determination that Carter's incarcerations affected each prong of the best-interests test is supported by substantial evidence in the record. Further, Carter's inattention to his children's needs resulted in Cade and Cody developing enduring bonds with their resource parents. See In re Guardianship

14

of J.C., 129 N.J. at 18 ("prolonged inattention by natural parents that permits the development of disproportionately stronger ties between a child and foster parents may lead to a bonding relationship the severing of which would cause profound harm—a harm attributable to the natural parents . . . .")

B.     Prong Two

As is often the case, the findings regarding the first prong informed and overlapped the second.  See N.J. Div. of Youth & Family Servs. v. R.L., 388 N.J. Super. 81, 88 (App. Div. 2006).  With respect to prong two, the court similarly concluded that Carter failed to cure or "overcome the initial harm that endangered [the] health, safety or welfare of [the] children, and . . . [he] was unable to continue a parental relationship without [causing] recurrent harm . . . ."  The court further stated that Carter was not able to "provide a safe and stable home for [the] children, . . . the delay in securing permanency continue[d] or add[ed] to the children's harm, . . . [and] . . . [t]he children have formed a secure attachment with their . . . resource parents and would be harmed if remov[ed] . . . ."

There was substantial evidence supporting the court's factual findings and legal conclusions with respect to prong two.  For example, the court noted Carter's involvement in the illegal sale of drugs, his failure to take responsibility

15                                          A-5613-16T2

for domestic violence incidents and his refusal to adequately acknowledge his substance abuse issues. The court relied upon Dr. Miller's testimony that Carter's actions "demonstrated a pattern of parental deficits to provide safety, care or minimal nurturement" to his children and that his anti-social behavior was not likely to change in the foreseeable future. Finally, Dr. Miller testified that the children did not have an emotional bond with Carter but were securely attached and bonded with their resource parents and separating them would cause enduring and significant harm. See N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 447 (2012); N.J. Div. of Youth & Family Servs. v. L.J.D., 428 N.J. Super. 451, 474-77 (App. Div. 2012).

C.    Prong Three

Regarding the third prong, reasonable efforts is defined to include "[c]onsultation and cooperation with [the parent] in developing a plan for appropriate services; providing services that have been agreed upon, to the family, in order to further the goal of family reunifications; . . . and facilitating appropriate visitation." N.J.S.A. 30:4C-15.1(a)(3). Services provided by the Division must be tailored to the parent's needs, but "are not measured by their success." In re Guardianship of D.M.H., 161 N.J. 365, 393 (1999).

Here, there was substantial evidence supporting the trial court's finding that the Division made reasonable efforts to provide Carter with services designed to overcome the circumstances that resulted in the children's out-of-home placements. See K.H.O., 161 N.J. at 354. Those services included psychological and substance abuse evaluations and treatment, domestic violence counseling, and supervised visitation.

The court also correctly determined that the Division considered alternatives to termination of parental rights and correctly noted that the Division had explored family members as possible placement options for the children.[3] Contrary to Carter's argument, there were no alternatives to the termination of parental rights. Each of the potential placements, including his former wife, Lisa, were reasonably ruled out, as it was in the best interests of the children to remain with their resource parents, with whom they were bonded.

Carter maintains the Division did not satisfy prong three because it failed to timely investigate Lisa as a placement for Cade and Cody, noting that the Division did not rule Lisa out as a placement until the termination trial was

---

[3] While the "Division has a statutory duty to evaluate relatives as potential caretakers, there is no presumption favoring the placement of a child with such relatives." N.J. Div. of Youth & Family Servs. v. J.S., 433 N.J. Super. 69, 82 (App. Div. 2013).

underway. Carter claims by that time, the children were bonded with their resource family, an outcome that could have been avoided had the Division promptly investigated Lisa and placed the children with her.

Our review of the record reveals that Carter first proposed Lisa as a potential placement in September 2016, after the guardianship complaint was filed. By that time, Cade had been placed outside the home for two years and Cody had been placed with his current resource parent for nearly one year. Further, and contrary to Carter's claim that the Division "did nothing" and "did not . . . make a visit, or do a background check, or make a phone call to Lisa," the record reflects that the Division attempted to contact Lisa on September 27, 2016, when the Division caseworker "left a detailed voicemail [with her telephone number] explaining that she was from the Division . . . , and she would like to speak with her about being a potential resource for Cade." At trial, the caseworker testified that she visited Lisa's home and spoke to her regarding her commitment to the boys and had concerns that placing the children with her was not in their best interests because "there isn't a relationship between [Lisa] and Cade and Cody," and Lisa "hasn't tried to contact the Division. [Carter] . . . put her name forward but she never reached out to me directly."

Brenda claims that the Division failed to consider her mother as a possible placement. As noted, the record reveals that in September 2014, Randi made a single request to care for Cade. At that time, however, Cade was in Carter's custody, not the Division's. Nevertheless, the Division advised Brenda and her mother that she would need to be licensed as a foster parent. According to the Division records, the "family did not want to listen to the [caseworker], and they continued to interrupt the [caseworker's explanation]."

Other than requesting visitation with the boys, there is no indication that Randi sought to care for the children after her initial inquiry regarding Cade. Similar to its decision with respect to Lisa, the Division ultimately ruled her out in accordance with N.J.S.A. 30:4C-12.1(c)[4] based on Dr. Miller's opinion that

---

[4] N.J.S.A. 30:4C-12.1(a) provides that "[i]n any case in which the [Division] accepts a child in its care or custody, . . . the [Division] shall initiate a search for relatives who may be willing and able to provide the care and support required by the child." "The [Division] shall . . . assess[] . . . each interested relative's ability to provide the care and support, including placement, required by the child." Pursuant to N.J.S.A. 30:4C-12.1(b), if the Division "determines that the relative is unwilling or unable to assume the care of the child, . . . [t]he [Division] shall inform the relative in writing of . . . the reasons for [its] determination . . . ." Subsection (c) allows the [Division] to "pursue the termination of parental rights if the [Division] determines that [it] is in the child's best interests." N.J.S.A. 30:4C-12.1(c).

removing the children from their resource placements would be contrary to their best interests.[5]

Carter and Brenda's reliance on J.S., 433 N.J. Super. 69 and N.J. Div. of Youth and Family Servs. v. K.L.W., 419 N.J. Super. 568 (App. Div. 2011) in support of their claim that the Division failed to satisfy prong three is misplaced. In J.S., the court addressed the

> Division's authority to reject a relative on 'best interests' grounds under subsection (c) of N.J.S.A. 30:4C-12.1 to relieve it of its responsibility under subsection (a) of that statute requiring it to conduct a fair investigation of such relative who identifies himself or herself as a potential caretaker in a reasonably prompt manner. Id. at 87.

---

[5] As noted, supra at p. 9, the Division sent Randi its rule-out letter on May 22, 2017. While N.J.S.A. 30:4C-12.1(c) does not impose a time deadline on the Division to send a "best interests" rule-out letter, see J.S., 433 N.J. Super. at 89 n.11, we concur with the J.S. court that the Division should have advised Randi earlier if it concluded that she had been rejected as a caretaker. Ibid. In this regard, we note that a May 6, 2016 Division contact sheet stated that the Division also learned that Randi "should be ruled out" because "she is on housing in [New York] and can[']t put anyone on the list." There is no indication, however, that the Division communicated the finding in the May 6, 2016 contact sheet to Randi.

In any event, we note that Randi has not challenged the court's best interests finding and, in the end, we are satisfied from our independent review of the record that the trial court correctly analyzed prong three and determined that the Division adequately considered alternatives to termination. We also agree with the court that to remove the children from their bonded resource families was contrary to their best interests.

The J.S. court cautioned that the Division is not permitted to ignore "a relative's timely application out of bureaucratic inertia, or consider that application based upon an arbitrary, preordained preference for foster placement." Ibid. The court further explained that the Division's investigation of relatives must be "sensitive to the passage of time and the child's critical need for finality and permanency." Ibid. The court noted that if the Division "has been lax or capricious in its assessment of such timely-presented alternative caretakers, it bears the litigation risk that a Family Part judge will conclude . . . that it has failed to prove [prong three] by clear and convincing evidence . . . ." Ibid.

In K.L.W., when discussing the Division's obligation under N.J.S.A. 30:4C-12, the court explained that a parent cannot "expect the Division to locate a relative with no information or, . . . wait until the eve of the guardianship trial to identify a relative who is willing to adopt," but also stated that the Division cannot engage in "willful blindness and inexplicable delay in assessing and approving or disapproving a relative known to the Division, especially one whom the Division knows has custody of the child's siblings." 419 N.J. Super. at 582.

21

Here, the Division explored multiple relatives for placement of Cade and Cody. As noted, Cade was initially placed with Carter and then with his paternal uncle. The Division also considered the children's paternal grandmother and paternal aunt, and determined it would be inappropriate to place the children with them. Thus, this is not the case where the Division rejected any of the relatives based upon an "arbitrary, preordained preference for foster placement," J.S., 437 N.J. Super. at 87, or engaged in "willful blindness." K.L.W., 419 N.J. Super. at 582. As to Lisa, she was proposed after the guardianship complaint was filed and after Cade had been in placement for approximately two years and Cody for approximately one year. She was investigated and ruled out. Randi only requested care of Cade and never expressed an interest in caring full-time for both children, despite seeking visitation, and did not take the recommended steps to become licensed. See N.J. Div. of Youth & Family Servs. v. L.M., 430 N.J. Super. 428, 445 (App. Div. 2013) (prong three is satisfied where a potential resource placement fails to complete a family training program). In these circumstances, we cannot conclude that the Division engaged in "inexplicable

delay in assessing . . . a relative known to the Division."[6]    K.L.W., 419 N.J. Super. at 582.

D.    Prong Four

The court's findings and conclusions as to prong four are also supported by adequate, substantial, and credible evidence in the record. Although Cade and Cody had positive interactions with Carter during visitations, they had not developed an enduring emotional or psychological bond with him. Rather, as a result of his persistent inability to provide them with safe and stable parenting, the children had bonded with their resource parents, who wished to adopt them, and severance of those bonds would cause severe harm.

Carter also argues that the Division did not clearly and convincingly satisfy the fourth prong because separating Cade and Cody would do more harm than good as it would deprive them of a relationship with each other and their biological relatives. In reaching its conclusion, the court considered and rejected Dr. Burr's opinion that the children should be placed together, with Jane in Cade's resource home, and instead credited Dr. Miller's testimony that Cade

---

[6] On appeal, the Law Guardian maintains the Division correctly "made reasonable efforts to reunify the family and considered alternatives to termination, including the rule out of [Lisa] . . . thereby meeting the standard under prong three of the best interests test."

and Cody did not have a significant emotional bond, and the children's bond with their respective resource parents was more important to their long-term emotional and psychological health than their sibling relationship. According to Dr. Miller, this was the "least detrimental outcome." The fact that Cade and Cody were placed in separate resource homes does not undermine the soundness of the trial court's determination that the Division satisfied the criteria under N.J.S.A. 30:4C-15.1(a).

Finally, we disagree with Brenda's claim that the Division's actions violated CPBRA, which mandates that a child is entitled "[t]o the best efforts of the applicable department to place the child in the same setting with the child's sibling if the siblings is also placed outside the home . . . ." N.J.S.A. 9:6B-4(d). Rights under the CPBRA must be exercised "consistent with the health, safety and physical and psychological welfare of the child and as appropriate to the individual circumstances of the child's physical or mental development." N.J.S.A. 9:6B-4. In other words, placement of siblings together is an important and critical consideration that the Division must undertake but the final decision about where to place a child remains subject to a best-interests analysis. Based on Dr. Miller's testimony and the other trial evidence, Judge DeLorenzo

concluded it was in the children's best interests to remain in their respective resource homes.

To the extent not addressed, defendant's remaining arguments lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5613-16T2