# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2191-22

NEW JERSEY DIVISION OF
CHILD PROTECTION AND
PERMANANCY,

 Plaintiff-Respondent,

v.

B.C.,[1]

 Defendant-Appellant,

and

A.A.,

 Defendant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF A.A.
and J.A., minors.

_____

Submitted March 12, 2024 – Decided April 2, 2024

---

[1] We employ initials and pseudonyms to identify the parties, the children, and others to protect the children's privacy and because the records relating to Division proceedings held under <u>Rule</u> 5:12 are excluded from public access under <u>Rule</u> 1:38-3(d)(12).

Before Judges Smith and Perez Friscia.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Cumberland County, Docket No. FG-06-0035-23.

Jennifer Nicole Sellitti, Public Defender, attorney for appellant (John Andrew Albright, Assistant Deputy Public Defender, of counsel and on the briefs).

Matthew J. Platkin, Attorney General, attorney for respondent (Janet Greenberg Cohen, Assistant Attorney General, of counsel; Julie Beth Colonna, Deputy Attorney General, on the brief).

Jennifer Nicole Sellitti, Public Defender, Law Guardian, attorney for minors (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Jennifer Marie Sullivan, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

Defendant B.C. (Bianca) appeals from the Family Part's March 6, 2023 judgment terminating her parental rights to her twin sons, A.A. (Adam) and J.A. (John), and granting guardianship to the New Jersey Division of Child Protection and Permanency (Division) with the permanency plan that the twins be adopted by their resource parents. Bianca argues the trial court erroneously issued her a time ultimatum rather than undertaking a best interests analysis. She further argues the court erred in finding the Division had proven by clear

and convincing evidence the four prongs of the best interests test warranting termination of her parental rights under N.J.S.A. 30:4C-15.1(a). The law guardian argues the Division has proven that each of the best interests prongs to terminate Bianca's parental rights and that the court's judgment should be affirmed. Having reviewed the record, the parties' contentions, and the applicable law, we affirm the judgment because the court correctly applied the law, and substantial credible evidence supports its findings.

I.

We summarize the pertinent facts established during the guardianship proceeding. Following a two-day trial, the court terminated Bianca's parental rights due to her history of substance abuse. Bianca is Adam and John's biological mother. Bianca was married to the twins' biological father, A.A. (Alex).[2] Adam and John have a sister, A.A. (Ashley), two half-sisters, A.P. and M.P., and other half-siblings. Bianca shares joint legal custody of Ashley with her mother, D.W. (Diane), who has residential custody. Bianca, however, does not have physical custody of any of her children.

---

[2] Although his name is not on the birth certificate, Alex's paternity has not been disputed. The court also terminated Alex's parental rights. Alex is not a party to this appeal.

A-2191-22

Between 2009 and 2020, the Division received multiple referrals involving Bianca related to substance abuse, domestic violence, and inadequate supervision. On November 2, 2020, the Division received a referral from an Inspira Hospital employee reporting that Bianca was homeless, had delivered twin boys, and tested positive for opiates. She had admitted to recently using four bags of heroin.

While at the hospital, Bianca was accompanied by a man who claimed his name was Joey. During the Division's investigation, Joey refused to provide his last name, and would not cooperate with the caseworker. They denied Joey was the twins' father, maintaining he was only a "best friend and support person." After the Division interviewed Bianca at the hospital, she left against medical advice. The twins remained in the neonatal intensive care unit for twenty-four days and were observed for withdrawal symptoms. On November 25, 2020, the hospital discharged the twins to the Division's care, and they were placed in a resource home. Although Bianca provided the Division with possible family members for placement, the Division placed the twins with a family friend because, after investigation, no family placement provided was appropriate. Diane had declined placement as she had joint legal custody of Ashley; Bianca's maternal aunt was ruled out due to a history of substance abuse; Bianca's sister

had declined; and Alex's aunt was ruled out as Bianca provided her name too late and her partner, who had a criminal record, would not complete a background check.

The Division offered Bianca immediate services, including a substance abuse evaluation, random urine screens, a meeting with a domestic violence liaison, and a referral for Keeping Families Together (KFT) housing assistance. Parenting time initially occurred at Diane's house; however, due to ongoing COVID-19 pandemic concerns, the Division moved visits to its local office. Bianca acted appropriately with the twins but complained about the visitation site.

After missing several evaluations, Bianca attended a substance abuse evaluation, which recommended intensive outpatient treatment. She began the recommended treatment at a rehabilitation center in February 2021, but was discharged before reentering and completing the substance abuse program in October 2021.

On May 17, 2021, the Division placed the twins in a new home with resource parents, E.W. (Eric) and A.W., friends of Bianca's sister who were willing to adopt. In June 2021, Bianca began having supervised parenting time at Diane's home with the twins, which permitted her other children time with

their brothers. Thereafter, Bianca had unsupervised parenting time for two-hour visits.

In November 2021, KFT approved Bianca for housing assistance; however, a housing unit was unavailable until April 2022. The Division additionally referred Bianca to parent support services for assistance in finding employment despite her criminal record, though she did not utilize the services. In December 2021, Bianca received increased parenting time with unsupervised overnights at Diane's house after completing treatment and maintaining negative drug tests. On December 20, 2021, the court entered a self-executing order granting the Division "authority to allow for reunification."

From January to May 2022, Bianca was employed and continued unsupervised parenting time. However, in January, February, and March 2022, Bianca tested positive for benzodiazepines, marijuana, and methadone. On May 26, 2022, Bianca tested positive for cocaine and in June admitted to using cocaine for a few months to the caseworker. The Division reinstated supervised visitation at the Division office, and KFT advised that Bianca was at risk of losing her housing. Bianca failed to: maintain contact with the Division, consistently attend visits with the twins, complete multiple drug screens, and attend substance abuse evaluations. On August 25, 2022, Bianca re-entered

6

substance abuse treatment; however, she continually tested positive for cocaine and fentanyl, resulting in her November 2022 discharge from the treatment program.

On October 23, 2022, the Division filed an order to show cause and a complaint seeking termination of Bianca's parental rights. Upon attempting to serve Bianca at her apartment, the caseworker observed a man with a neck tattoo like Alex's "walking a dog." The caseworker inquired the man's name, and he responded "Joey." A few days later, Alex contacted the caseworker to schedule a meeting, which he failed to attend. After she left the meeting place, Alex telephonically threatened the caseworker who thereafter filed a police complaint. The next day, the Division placed a "red alert on the case" and informed Multi Therapy Services (MTS)—who supervised parenting time—of their safety concerns. MTS ceased supervision outside of the Division office, specifically excluding visits at Bianca's residence.

Bianca continued to decline referrals to substance abuse evaluations and test positive for illicit substances, including heroin and fentanyl. She also failed to attend multiple psychological and bonding evaluations scheduled by the Division. In January 2023, while facing eviction, Bianca re-entered a substance

A-2191-22

abuse treatment program, but tested positive for cocaine and fentanyl continually through the first day of trial on March 2, 2023.

During the Division's guardianship trial, the law guardian, appearing for the twins, supported termination of Bianca's parental rights. At trial, Bianca, resource parent Eric, and the Division caseworker testified.

Bianca admitted to being addicted to illegal substances since she was eighteen years old, specifying heroin was her drug of choice. She acknowledged receiving a recommendation for inpatient treatment but alleged "there wasn't a bed available" until the Monday following the trial. Although Bianca claimed compliance with the court-ordered Division services offered, she acknowledged she failed to complete random drug screenings, some scheduled parenting times, and the most recent substance abuse program. She further admitted she had violated the probation she was on resulting from shoplifting and drug possession convictions. Regarding housing, Bianca testified she "voluntarily withdrew" from the KFT program but remained in the apartment with family financial assistance.

Eric testified he and his wife had a loving relationship with the twins, who called the couple "dada" and "mama." They "tr[ied] to keep [a] consistent" routine with the twins. The twins awakened each day between 5:00 and 6:30

A-2191-22

a.m., ate breakfast, listened to music, and danced around. Eric did not believe kinship legal guardianship (KLG) was in the twins' best interests "because . . . they need[ed] a routine." He expressed KLG would "be confusing for the kids" since it "end[ed] when [the twins turn eighteen] years old." He stated he was committed to the twins "to [his] last breath." While acknowledging Bianca would likely not retain guardianship of the children in a KLG arrangement, Eric was concerned for the twins' stability. He stated, "say, somehow, she does get . . . them back, how do we know they're going to be in a stable house? With us, . . . we have stability, routine, structure, consistency."

The caseworker observed the twins were "very happy" and "excited" with the resource parents. She testified, "the children really connected to th[e] foster father" and when everyone, including Bianca, was together, the twins "wanted to go to [Eric]."

The caseworker relayed the Division's main concern remained Bianca's substance abuse. Of nine substance abuse evaluation referrals, the caseworker confirmed Bianca only completed one. Bianca was "noncompli      ant"      with her current substance abuse treatment program and was discharged from her previous substance abuse treatment as "unsatisfactory." While the program had

recommended Bianca attend inpatient services, the caseworker testified Bianca informed the Division "that she was going to go" to outpatient treatment.

Bianca missed approximately fifteen court-ordered random urine screenings. Further, she refused to attend the court-ordered domestic violence services. Following a court-ordered urine screen during the trial, Bianca tested positive for cocaine, methadone, and fentanyl.

In an oral decision, the trial court granted the Division's request for guardianship. The court found the Division had proven all four prongs of the best interests standard under N.J.S.A. 30:4C-15.1(a), entered an order terminating the parents' parental rights, and awarded guardianship of the twins to the Division for permanent placement and adoption.

On appeal, Bianca argues:

POINT I

THE FAMILY PART IMPROPERLY TERMINATED [BIANCA]'S RIGHTS TO HER SONS BY APPLICATION OF A TIME SENSITIVE ULTIMATUM ADMINISTERED AND FULFILLED BEFORE TRIAL RATHER THAN THE STATUTORY BEST INTERESTS TEST WARRANTING REVERSAL.

POINT II

GIVEN [BIANCA]'S COMPLETION OF TREATMENT AND SUSTAINED SOBRIETY

LEADING TO UNSUPERVISED WEEKEND VISITATION UNTIL JUNE 2022, HER UNFITNESS FOR PURPOSES OF PRONGS ONE AND TWO WAS NOT ESTABLISHED BY RELAPSE SHORTLY BEFORE TRIAL, WHICH WAS AT MOST A TEMPORARY PART OF THE RECOVERY PROCESS

POINT III

THE FAMILY PART'S PRONG THREE CONCLUSIONS ARE UNSUPPORTED BY THE RECORD AND THE RESULT OF IMPROPER BURDEN-SHIFTING, AS THE COURT IMPOSED THE BURDEN ON [BIANCA] TO PROVE HER CONDUCT MET WITH ITS DEMANDS WHILE [THE DIVISION]'S EFFORTS DID NOT INCLUDE THE REQUISITE LEVEL OF INPATIENT DRUG TREATMENT, AND KLG WAS NOT APPROPRIATELY CONSIDERED AS AN ALTERNATIVE TO TERMINATION OF PARENTAL RIGHTS.

A. The Family Part's prong three holding that [Bianca]'s efforts "fell short," reveals it improperly imposed a burden of proof on her.

B. Unreasonable efforts: [the Division] admitted that its "job in this case" was to provide [Bianca] with "whatever services she needs," established that inpatient level drug treatment was necessary, and then utterly failed to provide the necessary treatment for more than two years.

C. KLG was not appropriately considered as an alternative to termination of parental rights when the foster caregiver rejected KLG due to his

11

perception of his own "stability," as contrasted with [Bianca]'s present instability and poverty.

POINT IV

THE FAMILY PART'S FOURTH PRONG CONCLUSIONS THAT "THE BEST PLACE FOR THESE CHILDREN IS WITH THE RESOURCE PARENTS AT THIS POINT" AND THE CHILDREN COULD POTENTIALLY BE HARMED BY [BIANCA]'S "ACCESS" TO THEM IN THE FUTURE ARE LEGALLY ERRONEOUS AND TANTAMOUNT TO A PROHIBITED "BETTER INTERESTS" CONCLUSION.

A. The Family Part judge incorrectly relied on a "bond" between the foster caregivers and the children while utterly failing to consider [Bianca]'s relationship to her sons, or the catastrophic harm that will result from the destruction of that relationship, at all.

B. KLG was improperly used as a basis to terminate parental rights under the fourth prong.

II.

We review a trial court's decision to terminate parental rights with deference when its factual findings are "grounded in substantial and credible evidence in the record." N.J. Div. of Child. Prot. & Permanency v. D.C.A., 256 N.J. 4, 19 (2023). "Deference is especially appropriate 'when the evidence is largely testimonial and involves questions of credibility.'" Cesare v. Cesare, 154 N.J. 394, 412 (1998) (quoting In re Return of Weapons to J.W.D., 149 N.J.

108, 117 (1997)). "We accord deference to factfindings of the family court because it has the superior ability to gauge the credibility of the witnesses who testify before it and because it possesses special expertise in matters related to the family." N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 448 (2012). "[A] trial court's factual findings 'should not be disturbed unless they are so wholly unsupportable as to result in a denial of justice.'" N.J. Div. of Youth & Fam. Servs. v. P.P., 180 N.J. 494, 511 (2004) (quoting In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002)). We owe no deference to a judge's legal conclusions which are reviewed de novo. N.J. Div. of Child Prot. & Permanency v. A.B., 231 N.J. 354, 369 (2017).

"Parents have a constitutionally protected right to maintain a relationship with their children." N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 279 (2007). That right, however, "is not absolute" and is limited "by the State's parens patriae responsibility to protect children whose vulnerable lives or psychological well-being may have been harmed or may be seriously endangered by a neglectful or abusive parent." F.M., 211 N.J. at 447. In guardianship and adoption cases, such as here, it is well-established that "[c]hildren have their own rights, including the right to a permanent, safe[,] and stable placement." N.J. Div. of Youth & Fam. Servs. v. C.S., 367 N.J. Super.

76, 111 (App. Div. 2004). We acknowledge "the need for permanency of placements by placing limits on the time for a birth parent to correct conditions in anticipation of reuniting with the child." Ibid. Thus, a parent's interest must, at times, yield to the State's obligation to protect children from harm. See N.J. Div. of Youth & Fam. Servs. v. G.M., 198 N.J. 382, 397 (2009).

When terminating parental rights, the trial court applies the statutory best interests test, which requires considering four prongs:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm;
>
> (3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
>
> (4) Termination of parental rights will not do more harm than good.
>
> [N.J.S.A. 30:4C-15.1(a).]

The Division must prove each prong by "clear and convincing evidence." N.J. Div. of Child Prot. & Permanency v. D.H., 469 N.J. Super. 107, 115 (App.

14

Div. 2021). These prongs are not separate and overlap to inform a more general inquiry that the termination of parental rights is in a child's best interests. N.J. Div. of Child Prot. & Permanency v. R.L.M., 236 N.J. 123, 145 (2018). "The question ultimately is not whether a biological mother or father is a worthy parent, but whether a child's interest will best be served by completely terminating the child's relationship with that parent." N.J. Div. of Youth & Fam. Servs. v. T.S., 417 N.J. Super. 228, 249 (App. Div. 2010) (quoting N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 107 (2008)). "[P]arental fitness is the key to determining the best interests of the child." N.J. Div. of Youth & Fam. Servs. v. I.S., 202 N.J. 145, 170 (2010) (quoting In re Guardianship of K.H.O., 161 N.J. 337, 348 (1999)).

In 2021, the Legislature amended Title 30, which governs guardianship proceedings and contains the best interests standard, and Title 3B, which concerns KLG proceedings. L. 2021, c. 154. The Legislature amended only prong two of the best interests standard under N.J.S.A. 30:4C-15.1(a) by deleting the sentence, "[s]uch harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child." Compare L. 2021, c. 154, § 9 (current N.J.S.A. 30:4C-15.1(a)(2)), with L. 2015, c. 82, § 3 (prior version). The

amendment did not preclude a court's consideration of a child's bond to a resource parent under prong four. The Supreme Court elucidated "[t]he Legislature acted to preclude trial courts from considering harm resulting from the termination of a child's relationship with resource parents when they assess parental fitness under the second prong, but not to generally bar such evidence from any aspect of the trial court's inquiry." D.C.A., 256 N.J. at 26 (citing L. 2021, c. 154). To foreclose a child's bond with their resource parents from consideration "would deprive a court of crucial information as it determines a child's future, and could imperil children whom New Jersey is charged to protect." Id. at 27-28.

As to Title 3B, the Legislature removed the requirement that courts find "adoption of the child is neither feasible nor likely" before courts can appoint a caregiver as a KLG. Compare L. 2021, c. 154, § 4 (current N.J.S.A. 3B:12A-6(d)(3)), with L. 2006, c. 47, § 32 (prior version). As amended, the KLG Act ensures that a resource parent's willingness to adopt no longer forecloses KLG. See N.J.S.A. 3B:12A-6(d)(3). However, "awarding kinship legal guardianship" must still be "in the child's best interests." N.J.S.A. 3B:12A-6(d)(4).

## A.

The Division, under prong one of N.J.S.A. 30:4C-15.1(a), must prove by clear and convincing evidence "the child's safety, health, or development has been or will continue to be endangered by the parental relationship." "[T]he Division must prove harm that 'threatens the child's health and will likely have continuing deleterious effects on the child.'" N.J. Div. of Youth & Fam. Servs. v. A.L., 213 N.J. 1, 25 (2013) (quoting K.H.O., 161 N.J. at 532). "Although a particularly egregious single harm" can suffice, the "focus is on the effect of harms arising from the parent-child relationship over time on the child's health and development." K.H.O., 161 N.J. at 348.

Bianca's contention that the court improperly terminated her parental rights based on a prejudicial "time-sensitive ultimatum" of drug use abstinence rather than a best interests analysis is unsupported. The record demonstrates the court comprehensively recited the factual background before providing findings under each of the four prongs. Describing the origination of the action, the court described the undisputed harm caused to the twins "at birth because of [Bianca's] drug use." The court further reasoned that the Division brought the guardianship action because of Bianca's "ongoing drug use," "housing instability," "unwillingness to find employment," and "unwillingness to address those things

17                                                                      A-2191-22

that would allow her to parent her children." Describing Bianca's struggle "with substance abuse, cocaine, heroin, [and] fentanyl" and inability to take the necessary "steps to abate her drug use and addiction over the past two years," the court referenced the "explicit" notice given to Bianca when it rejected the Division's prior permanency and termination plan affording her further time to become substance abuse free.

The court explained it warned Bianca that her actions and "conduct over the next [thirty] days" would determine the ultimate outcome. The court had hoped "that [she] would have done" what was necessary to discontinue her substance abuse and engage in the services offered before returning to court. The argument that the court demonstrated bias in finding she was unable to "stay clean" is unsupported by the record. We discern no error in the court's recitation of factual findings, which included Bianca's history of relapse and instability.

Further, while Bianca correctly posits that relapse is a potential step in substance abuse recovery, that reality does not serve to indefinitely delay the court's guardianship review of the twins' best interests. In addition to Bianca's inability to be free of substance abuse, the court found her lack of "effort" to find steady employment and housing detrimentally affected the twins' safety, health, and development. "Courts need not wait to act until a child is actually

18

irreparably impaired by parental inattention or neglect." In re Guardianship of D.M.H., 161 N.J. 365, 383 (1999). Indeed, "A parent's withdrawal of . . . solicitude, nurture, and care for an extended period of time is in itself a harm that endangers the health and development of the child." Id. at 379. The court's findings are supported by substantial credible evidence.

B.

Pursuant to prong two, the Division must demonstrate that the parent "is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm." N.J.S.A. 30:4C-15.1(a)(2). The Division may seek termination when there are "indications of parental dereliction and irresponsibility, such as the parent's continued or recurrent drug abuse, [and] the inability to provide a stable and protective home." K.H.O., 161 N.J. at 353. Because the first two prongs are closely intertwined, "evidence that supports one [prong] informs and may support the other as part of the comprehensive basis for determining the best interests of the child." D.M.H., 161 N.J. at 379.

The record establishes that Bianca was: unwilling to eliminate the harm her substance abuse caused to the twins; unable to provide a safe and stable

home; and delaying permanent placement due to the long-term lack of stability. The court correctly noted the twins were born dependent on substances in 2020 and required twenty-four days of hospitalization to ensure detoxification and withdrawal from the narcotics. Bianca's failure to take the necessary "steps" to cease "her drug use" and her failure to complete "referral after referral for drug evaluation and treatment" demonstrated she was unwilling or unable to eliminate the harm. Bianca had finished the treatment program in October 2021, after being discharged as non-compliant in April 2021 and reentering the program, but her continuous relapses required further treatment. After limitedly maintaining sobriety and having successful overnight unsupervised parenting time, Bianca relapsed in January 2022 and tested positive for cocaine and fentanyl consistently until trial.

Bianca's argument that "treatment was never provided" and that with treatment, "she would be fine in relatively short order" is belied by the record. After Bianca had reentered treatment, she failed to complete the program and was discharged in November 2022. The Division made a new referral on November 23 for substance abuse treatment, but Bianca failed to attend the necessary evaluation. For over two years, while the twins were in the resource parents' care, Bianca failed to complete multiple programs.

The court found Bianca credibly testified that she struggled with substance abuse since she was eighteen but determined her testimony regarding waiting for an inpatient treatment "bed" was incredible. We have recognized the balance of children's rights, and determined "[p]arents do not have the right to extend litigation indefinitely until they are able to safely care for their children." N.J. Div. of Child Prot. & Permanency v. S.D., 453 N.J. Super. 511, 524 (App. Div. 2018). The court's finding under prong two that it was "clearly convinced" Bianca "continued to abuse opiates and cocaine . . . [a]nd remained in that situation," which prevented her from eliminating the harm to the twins, was amply supported by substantial credible evidence.

C.

Prong three of the best interests test requires the Division to have "made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court [must have] considered alternatives to termination of parental rights." N.J.S.A. 30:4C-15.1(a)(3). "Reasonable efforts" include, but are not limited to: (1) "consultation and cooperation with the parent in developing a plan for appropriate services"; (2) "providing services that have been agreed upon, to the family, in order to further the goal of family reunification"; (3) "informing the

parent at appropriate intervals of the child's progress, development, and health"; and (4) "facilitating appropriate visitation." N.J.S.A. 30:4C-15.1(c). Courts do not measure reasonableness by the "success" of the efforts. N.J. Div. of Youth & Fam. Servs. v. J.S., 433 N.J. Super. 69, 90 (App. Div. 2013) (quoting D.M.H., 161 N.J. at 393). What is reasonable "depend[s] on the facts and circumstances of each case." N.J. Div. of Child Prot. & Permanency v. R.G., 217 N.J. 527, 557 (2014).

We reject Bianca's argument the Division failed "to provide the necessary level of treatment" and identify an "inpatient drug treatment" program until the eve of trial. The record demonstrates the Division referred Bianca to multiple scheduled evaluations to ascertain appropriate alternative treatment, including nine referrals for substance abuse evaluations. Bianca failed to attend eight of those nine evaluations. The record supports the court's finding under prong three that the Division made "reasonable efforts to provide the services and reunify Bianca with her children." As the court correctly reasoned, the Division's reasonable efforts were demonstrated by the scheduled "evaluations for drug use" and coordinated "visits" she attended.

Bianca's contention that the court improperly shifted the burden upon her to prove her "efforts" is also without merit, as the court's reference to her efforts

was regarding her failure to utilize the Division services offered and to avail of the appointments scheduled for her and the twins' benefit.  The Division made services available to help "correct the circumstances" but could not force Bianca to attend.  See N.J.S.A. 30:4C-15.1(a)(3).  We discern no error in the court's finding.

Finally, the court's prong three findings regarding alternatives to termination noted the resource parents have had the twins for almost two years and sought adoption.  The court stated it was convinced, "if the children were placed . . . in a KLG situation, . . . where [Bianca] would have more access to the children, those children would be put into a life of turmoil because of [her] ongoing . . . drug use, instability, [and] lack of ability to support herself."  We note the court provided its findings regarding KLG as an alternative to termination after addressing the prong four findings.  The sequence of the court's findings does not negate that it correctly made KLG determinations, which were amply supported by the record.  Therefore, Bianca's argument that alternatives to termination were not considered is misplaced.

The Division clearly investigated KLG alternative options, but the record demonstrates no family members qualified.  It is undisputed Bianca's three other children were in the care and custody of different grandparents who were not

23

willing to care for the twins, and other family members were not willing or available.  Thus, the court correctly concluded no KLG opportunities existed.

D.

Under prong four, termination of parental rights must "not do more harm than good."  N.J.S.A. 30:4C-15.1(a)(4).  The issue is "whether a child's interest will best be served by completely terminating the child's relationship with that parent."  E.P., 196 N.J. at 108.  Consideration of a child's bond with resource parents is permitted to ensure "the State's parens patriae obligation to protect the welfare of children."  D.C.A., 256 N.J. at 27.

The court determined "termination of parental rights will not do more harm" under prong four, finding Eric's testimony that the twins were "thriving" and "in a stable home" credible.  Further, the court found the "best place for these children [wa]s with the resource parents" who had "bonded with the children."  Again, the court had found credible Bianca's acknowledgement that her drug dependency had an "injurious effect" and had determined "she ha[d] been unwilling and unable to fix" her substance abuse dependency.  Further, it was established that the resource parents wanted adoption and were not in agreement with KLG.

Bianca's argument that an expert was required for the court to conclude the twins had bonded with the resource parents is also misplaced. Generally, the Division's proofs should include testimony by an expert who has had an opportunity to make a "comprehensive, objective, and informed evaluation of the child's relationship with the foster parent," id. at 22 (quoting In re Guardianship of J.C., 129 N.J. 1, 19 (1992)), and the court must also consider "parallel proof relating to the child's relationship with his or her natural parents in assessing the existence, nature, and extent of the harm facing the child," N.J. Div. of Youth & Fam. Servs. v. A.R., 405 N.J. Super. 418, 440 (App. Div. 2009) (quoting J.C., 129 N.J. at 19). However, where the termination is "not predicated upon bonding, but rather reflect[s] [the child's] need for permanency and [the biological parent's] inability to care for [the child] in the foreseeable future," a lack of a bonding evaluation is not fatal to the Division's case. See N.J. Div. of Youth & Family Servs. v. B.G.S., 291 N.J. Super. 582, 593-94 (App. Div. 1996).

We observe that while Bianca argues the necessity for expert testimony, she failed to appear for multiple scheduled psychological and bonding evaluations, thus thwarting the Division's ability to obtain an expert report with her participation. After her failure to participate, Bianca cannot now credibly

argue the Division failed to obtain a bonding expert. The court's finding that credible evidence existed to conclude the twins had bonded with the resource parents after being in their care for almost two years and that it was in their best interests to be adopted into a stable home, noting no alternative option, is well supported by the record.

Finally, to the extent we have not otherwise addressed any of Bianca's remaining arguments, we determine they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION