# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE Division**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2763-22

NEW JERSEY DIVISION OF
CHILD PROTECTION AND
PERMANENCY,

     Plaintiff-Respondent,

v.

S.Z.K., M.H., a/k/a T.M.H.,
and T.G., a/k/a T.L.,

     Defendants,

and

D.M.,

     Defendant-Appellant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF
D.D.M.M., and S.A.H., minors.

_____

Submitted April 8, 2024 – Decided April 23, 2024

Before Judges Marczyk, Chase, and Vinci.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Essex County, Docket No. FG-07-0040-21.

Jennifer Nicole Sellitti, Public Defender, attorney for appellant (Louis W. Skinner, Designated Counsel, on the briefs).

Matthew J. Platkin, Attorney General, attorney for respondent (Sara M. Gregory, Assistant Attorney General, of counsel; Alicia Y. Bergman, Deputy Attorney General, on the brief).

Jennifer Nicole Sellitti, Public Defender, Law Guardian, attorney for minor D.D.M.M. (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Jennifer Marie Sullivan, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

Defendant D.M. appeals the Family Part's April 24, 2023 final judgment terminating his parental rights to his biological daughter, D.D.M.M. ("Dawn").[1] Dawn's mother, S.Z.K., entered an identified surrender of Dawn and does not take part in this appeal. Because the trial court correctly applied the law, and substantial credible evidence supports its findings, we affirm.

---

[1] We employ initials and pseudonyms to identify the parties, the children, and others to protect the children's privacy and because the records relating to Division proceedings held under Rule 5:12 are excluded from public access under Rule 1:38-3(d)(12).

I.

In May 2021, Dawn was born prematurely, weighing approximately one pound. The Division of Child Protection and Permanency ("Division") became involved with D.M. and Dawn on the date of Dawn's birth. The Division had been involved with S.Z.K. and her four older children since 2017. Dawn has several half-siblings; her maternal siblings have all been adopted by other relatives, and her paternal siblings do not reside with D.M.

Shortly after Dawn's birth, the Division met with S.Z.K. and D.M. S.Z.K. provided Dawn's maternal great-aunt, Y.J., as a placement resource. At that time, D.M. was residing with his mother and wanted Dawn to reside there with him. If not, he wanted her placed with Y.J. D.M. declined to offer any other potential placement resources.

D.M. denied prior Division involvement, denied having a criminal history, and claimed to maintain both stable employment and stable housing for Dawn. A background check revealed D.M. had a criminal history, he did not have stable employment, and the Division was currently investigating allegations of sexual abuse involving one of his other children, but he had yet to comply with the requested sexually transmitted disease test. The Division also expressed concerns about some noted domestic violence issues between D.M. and S.Z.K.

A-2763-22

D.M. confirmed he and S.Z.K. often had physical altercations, but explained they were trying to cease such behavior. When the Division asked D.M.'s mother whether Dawn could reside in her home, she declined, citing several issues concerning her health and ability to care for Dawn.

In August 2021, Dawn was medically cleared for discharge. The Division again met with D.M. and his mother, and D.M. explained he and S.Z.K. agreed on the plan for Dawn to live under the care of Y.J. D.M.'s mother again declined to be a placement option for Dawn. D.M. also requested a "paternity test."[2] The Division also learned S.Z.K. suffered a black eye in a recent incident with D.M.

The next day, the Division obtained custody, care, and supervision of Dawn. She was discharged from the hospital and taken to Y.J.'s home. D.M. and S.Z.K. were permitted "liberal visitation" with Dawn supervised by Y.J. Two weeks later, Dawn underwent surgery to repair a hernia. Despite knowing about the surgery, D.M. and S.Z.K. did not attend. Following the surgery, Dawn required extensive follow-up medical care with many providers due to her premature birth, and Y.J. was diligent in ensuring Dawn received all necessary care.

---

[2] After not showing up for two scheduled genetic tests, D.M. was finally confirmed as the father in December 2021.

Throughout the rest of 2021, D.M. fluctuated in consistently visiting Dawn. During some visits, D.M. cared for Dawn by holding, feeding, and changing her; however, Y.J. expressed concerns that at times D.M. and S.Z.K. would argue during visits. Y.J. continued to provide for Dawn's daily medical needs and ensured she received the numerous necessary services for her development.

In November 2021, following further physical altercations with S.Z.K., D.M. was referred for domestic violence services. In December 2021, with the assistance of the Division, D.M. secured an apartment. D.M. was still unemployed, but the Division provided him with information on locating potential job opportunities.

The Division referred D.M. for a psychological evaluation with Mark Singer, Ed.D., which he attended in March 2022. Dr. Singer recommended D.M.: attend consistent supervised visitation with Dawn; participate in individual counseling, parenting-skills training, and drug treatment; undergo a psychiatric assessment; and obtain stable housing and employment. As a result, the Division referred D.M. to a psychiatric evaluation, individual therapy, substance abuse evaluation, parenting skills training, and batterer's intervention; however, he failed to complete any of the referred services.

5

On April 28, 2022, the Division confirmed D.M. had not visited Dawn since December 2021. Throughout May and June, 2022, D.M. occasionally visited Dawn; however, none of the visits were the mandated Division-supervised visits, and the visits did not occur frequently enough to establish a consistent visiting routine.

The Division assessed D.M.'s apartment in May 2022. The Division caseworker observed a one-bedroom apartment with properly working utilities. The caseworker also observed no furniture throughout the home and cigarette ashes and vomit on the floor. D.M. never provided a copy of his lease, as requested, for the Division to review.

In June 2022, D.M. obtained employment and continued sporadic visitation with Dawn. The Division provided D.M. with a bus pass for transportation to visits and other services. In early July 2022, D.M. and S.Z.K. attended a family party where they engaged in a physical altercation, which resulted in D.M. being arrested and charged with simple assault. Dawn was present at the family party but did not witness the altercation.

In July, D.M. was advised about the services he still needed to complete to make progress towards the goal of reunification. The Division also sent D.M. a letter in August 2022, providing details on the services and contact information

6

for each of the service providers. D.M. failed to attend four scheduled visits with Dawn in September 2022, and failed to visit with Dawn at all in October. When asked about the missed visits, D.M. said he was too busy.

During a meeting with the Division in November 2022, D.M. expressed his desire to share joint custody of Dawn with Y.J., which the Division believed meant he preferred the option of Kinship Legal Guardianship ("KLG"). Y.J. was not interested in this option, and the Division explained it could not force her to agree to KLG. Y.J. clearly expressed her desire to adopt Dawn and identified herself as the only person responsible for Dawn's medical care and other needs while highlighting the parents' failure to make any progress towards reunification over the previous year. The Division informed D.M. because Dawn had been in its care for over a year, it had changed its goal from reunification to adoption. To that point, D.M. had yet to complete any of the recommended services and failed to visit Dawn throughout November.

In November 2022, the Division again sent D.M. a letter listing the services he still needed to complete and included the contact information for each of the providers. D.M. was not responsive to the Division's efforts to meet in person or via telephone. The Division again sent D.M. multiple letters between December 2022, and February 2023, all advising him about the

guardianship litigation and listing the required services with the applicable contact information. D.M. remained unresponsive to the Division. He also did not respond to attempted Division visits in February 2023, and he failed to visit with Dawn as well.

A permanency hearing occurred over two days in April 2023. Despite having notice, D.M. did not appear. As its first witness, the Division presented C.G., another aunt of Dawn's who had adopted Dawn's older maternal half-siblings and had a relationship with Dawn and Y.J. The Division then presented Y.J. as well as J.O. and E.I., the caseworkers for Dawn. Defendant called no witnesses.

Prior to the court's decision, S.Z.K. surrendered her parental rights, identifying Y.J. as the person to adopt Dawn. In an oral decision, the trial court, after analyzing the four prongs of the best interests of the child test under N.J.S.A. 30:4C-15.1(a), entered an order terminating the parents' parental rights, awarding guardianship of Dawn to the Division for permanent placement and adoption by Y.J.

On appeal, D.M. argues the court erred in finding the Division satisfied by clear and convincing evidence the four prongs of the best interests test

warranting termination of his parental rights. The Law Guardian sides with the Division in urging we affirm the court's decision.

## II.

Our scope of appellate review is limited. It is well established that in Title 30 cases we will not second-guess or substitute our judgment for that of the family court, provided that its factual findings are "grounded in substantial and credible evidence in the record." N.J. Div. of Child Prot. & Permanency v. D.C.A., 256 N.J. 4, 19 (2023). "Deference is especially appropriate 'when the evidence is largely testimonial and involves questions of credibility.'" Cesare v. Cesare, 154 N.J. 394, 412 (1998) (quoting In re Return of Weapons to J.W.D., 149 N.J. 108, 117 (1997)). "We accord deference to fact[-]findings of the family court because it has the superior ability to gauge the credibility of the witnesses who testify before it and because it possesses special expertise in matters related to the family." N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 448 (2012). "[A] trial court's factual findings 'should not be disturbed unless they are so wholly unsupportable as to result in a denial of justice.'" N.J. Div. of Youth & Fam. Servs. v. P.P., 180 N.J. 494, 511 (2004) (quoting In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002)). We owe no deference to a

judge's legal conclusions which are reviewed de novo. <u>N.J. Div. of Child Prot.</u> <u>& Permanency v. A.B.</u>, 231 N.J. 354, 369 (2017).

The applicable law is clear. When terminating parental rights, the trial court applies the statutory best interests test, which requires consideration of four prongs:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm;
>
> (3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
>
> (4) Termination of parental rights will not do more harm than good.
>
> [N.J.S.A. 30:4C-15.1(a).]

The Division must prove each prong by "clear and convincing evidence." <u>N.J. Div. of Child Prot. & Permanency v. D.H.</u>, 469 N.J. Super. 107, 115 (App. Div. 2021). These prongs are not discrete and separate; they overlap to inform a more general inquiry that the termination of parental rights is in a child's best

interests. N.J. Div. of Child Prot. & Permanency v. R.L.M., 236 N.J. 123, 145 (2018). "The question ultimately is not whether a biological mother or father is a worthy parent, but whether a child's interest will best be served by completely terminating the child's relationship with that parent." N.J. Div. of Youth & Fam. Servs. v. T.S., 417 N.J. Super. 228, 249 (App. Div. 2010) (quoting N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 108 (2008)).

"Parents have a constitutionally protected right to maintain a relationship with their children." N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 279 (2007). That right, however, "is not absolute" and is limited "by the State's parens patriae responsibility to protect children whose vulnerable lives or psychological well-being may have been harmed or may be seriously endangered by a neglectful or abusive parent." F.M., 211 N.J. at 447. In guardianship and adoption cases, such as here, it is well-established that "[c]hildren have their own rights, including the right to a permanent, safe[,] and stable placement." N.J. Div. of Youth & Fam. Servs. v. C.S., 367 N.J. Super. 76, 111 (App. Div. 2004). We acknowledge "the need for permanency of placements by placing limits on the time for a birth parent to correct conditions in anticipation of reuniting with the child." Ibid. Thus, a parent's interest must,

at times, yield to the State's obligation to protect children from harm. See N.J. Div. of Youth & Fam. Servs. v. G.M., 198 N.J. 382, 397 (2009).

## III.

A main theme of D.M.'s arguments is that he is being unfairly penalized for his financial inability to provide a safe and stable home for Dawn. It "is well settled that poverty alone is not a basis for a finding of abuse or neglect." N.J. Div. of Youth & Fam. Servs. v. L.W., 435 N.J. Super. 189 (App. Div. 2014) (citing Doe v. G.D., 146 N.J. Super. 419, 430-31 (App. Div. 1976), aff'd sub nom., 74 N.J. 196 (1977)). However, the trial court's decision was not improperly based on D.M.'s poverty level. Rather, the trial court's decision was based on a litany of factors concerning defendant's well-documented actions and inactions.

## A.

Defendant argues the trial court erred in finding the Division satisfied the interrelated first two prongs of the best interests test, explaining he could not harm the child because he was never given an opportunity to care for her following her birth. Moreover, he argues even though his visits were inconsistent at times, he demonstrated significant effort to remain in the child's life and when visits did occur, he acted appropriately with the child and tended

12

to her needs. Therefore, he posits he is not unwilling or unable to eliminate the harm facing the child.

Under these two prongs, "[T]he Division must prove harm that 'threatens the child's health and will likely have continuing deleterious effects on the child.'" N.J. Div. of Youth & Fam. Servs. v. A.L., 213 N.J. 1, 25 (2013) (quoting In re Guardianship of K.H.O., 161 N.J. 337, 352 (1999)). The "focus is on the effect of harms arising from the parent-child relationship over time on the child's health and development." K.H.O., 161 N.J. at 348. The Division may seek termination when there are "indications of parental dereliction and irresponsibility, such as the parent's continued or recurrent drug abuse, [and] the inability to provide a stable and protective home [.]" Id. at 353. Because the first two prongs are closely intertwined, "evidence that supports one [prong] informs and may support the other as part of the comprehensive basis for determining the best interests of the child." D.M.H., 161 N.J. at 379. Moreover, a "parent's withdrawal of [parental] solicitude, nurture, and care for an extended period of time is in itself a harm that endangers the health and development of the child." Ibid.

The trial judge duly considered D.M.'s inconsistent visitation and lack of contact with Dawn for an extended period of time, his inability to remediate the

concerns that led to Dawn's initial placement, the concerns in his psychological evaluation, the lack of stable housing or employment, his domestic violence towards S.Z.K., and the condition of his housing with vomit and cigarettes on the floor. D.M. remained non-compliant with multiple services despite repeated offers to provide transportation and encouragement from caseworkers and providers. These actions and inactions demonstrated he could not eliminate the harm to Dawn. The record amply supports the judge's findings on prongs one and two.

B.

With respect to prong three, D.M. alleges the Division did not take reasonable steps to provide him with services. "Reasonable efforts" include, but are not limited to:

> (1) consultation and cooperation with the parent in developing a plan for appropriate services;
> (2) providing services that have been agreed upon, to the family, in order to further the goal of family reunification;
> (3) informing the parent at appropriate intervals of the child's progress, development, and health; and
> (4) facilitating appropriate visitation.
>
> [N.J.S.A. 30:4C-15.1(c).]

Courts do not measure reasonableness by the "success" of the efforts. N.J. Div. of Youth & Fam. Servs. v. J.S., 433 N.J. Super. 69, 90 (App. Div. 2013) (quoting

14

D.M.H., 161 N.J. at 393). What is reasonable "depend[s] on the facts and circumstances of each case." N.J. Div. of Child Prot. & Permanency v. R.G., 217 N.J. 527, 557 (2014).

The record is replete with the Division offering D.M. multiple services, in multiple ways, and on multiple occasions. These included, but are not limited to, psychological and psychiatric evaluations and treatment, substance abuse evaluation and treatment, referral to a batterer's intervention program, parenting class, supervised visitation through the Division, transportation assistance, and financial assistance. The trial judge found not only did the Division offer these services, but also "followed up and in every way attempted to engage [D.M.] in a process" that he simply failed to cooperate with.

D.M. also alleges the trial court was incorrect in finding prong three was satisfied because the Division did not follow its statutory mandate as to the relative placement and KLG. In 2021, the Legislature amended Title 30 and Title 3B, which concern KLG proceedings. L. 2021, c. 154. The current statute as revised provides KLG is proper when:

> (1) each parent's incapacity is of such a serious nature as to demonstrate that the parents are unable, unavailable or unwilling to perform the regular and expected functions of care and support of the child;

(2) the parents' inability to perform those functions is unlikely to change in the foreseeable future;

(3) in cases in which the [D]ivision is involved with the child as provided in [N.J.S.A 30:4C-85], . . . the [D]ivision exercised reasonable efforts to reunify the child with the birth parents and these reunification efforts have proven unsuccessful or unnecessary; and

(4) awarding [KLG] is in the child's best interests.

[N.J.S.A. 3B:12A-6(d).]

With this amendment, the Legislature removed a previous requirement that courts first find "adoption of the child is neither feasible nor likely" before appointing a caregiver as a KLG. Compare L. 2021, c. 154, § 4 (current N.J.S.A. 3B:12A-6(d)(3)), with L. 2006, c. 47, § 32 (prior version). As amended, the KLG Act ensures a resource parent's willingness to adopt no longer forecloses KLG. See N.J.S.A. 3B:12A-6(d)(3). However, the revision of the KLG statute did not eliminate the trial court's discretion, upon considering and weighing all the evidence, to favor a child's need for permanency over proffered alternatives. See, e.g., In re Guardianship of J.C., 129 N.J. 1, 26 (1992) ("[C]hildren have an essential and overriding interest in stability and permanency.").

The Division asked Y.J. about KLG well before trial. At trial, when asked whether she understood the difference between KLG and adoption, Y.J. testified she did, however, she wished to adopt the child as her legal child. Y.J.

confirmed her strong relationship with the foster parent of the child's other siblings, explaining they work together to ensure the children are together for major events, such as holidays and family vacations. Y.J. further explained she ensures the child has frequent interactions with her siblings. While Y.J. remained firm in her desire to adopt over KLG, she expressed openness to allowing both D.M. and S.Z.K. to maintain contact with Dawn at her discretion. No evidence was proffered to contradict the resource parent's desire to adopt. The trial court therefore reasonably concluded, "it is clear that this relationship — one of adoption with [Y.J.] is an appropriate placement, and there are no better alternatives to termination of parental rights[,]" and concluded the Division properly considered alternatives to termination, including KLG.

C.

Finally, D.M. argues the trial court's decision to terminate his parental rights under the fourth prong of the best interests test was improperly based on speculations as to his lack of sustainable housing, infrequent visitation, and overall unfitness to parent. He highlights the law guardian's failure to have an expert evaluate the parent-child bond, which he believes should have led the trial court to conclude the fourth prong was not met.

When amending Title 30, the Legislature amended only prong two of the best interests standard under N.J.S.A. 30:4C-15.1(a) by deleting the sentence, "[s]uch harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child." Compare L. 2021, c. 154, § 9 (current N.J.S.A. 30:4C-15.1(a)(2)), with L. 2015, c. 82, § 3 (prior version). The amendment did not preclude a court's consideration of a child's bond to a resource parent under prong four. Our Court has recognized "[t]he Legislature acted to preclude trial courts from considering harm resulting from the termination of a child's relationship with resource parents when they assess parental fitness under the second prong, but not to generally bar such evidence from any aspect of the trial court's inquiry." D.C.A., 256 N.J. at 26 (citing L. 2021, c. 154). To foreclose a child's bond with their resource parents from consideration "would deprive a court of crucial information as it determines a child's future and could imperil children whom New Jersey is charged to protect." Id. at 27-28.

The trial court held "there's hardly any positive [evidence supporting] continuing forward in a relationship with [D.M. because] he really hasn't attempted to develop relationship with the child or any kind of meaningful relationship." The trial judge explained D.M. has not provided care or assisted

18                                                                 A-2763-22

in providing care for the child and has not demonstrated his ability to provide or be willing to provide financial support for the child. The trial court placed a large emphasis on the value of the child residing with Y.J., whom he describes as "a loving, caring individual who stepped up," because it affords the child the best chance to live a healthy and happy life after being born with so many medical and personal difficulties.

Generally, the Division's proofs should include testimony by an expert who has had an opportunity to make a "comprehensive, objective, and informed evaluation of the child's relationship with both the natural parents and the foster parent[,]" M.M., 189 N.J. at 281, and the court must also consider "parallel proof relating to the child's relationship with his or her natural parents in assessing the existence, nature, and extent of the harm facing the child." N.J. Div. of Youth & Fam. Servs. v. A.R., 405 N.J. Super. 418, 440 (App. Div. 2009) (quoting In re Guardianship of J.C., 129 N.J. at 19). However, where the termination is "not predicated upon bonding, but rather reflect[s] [the child's] need for permanency and [the biological parent's] inability to care for [the child] in the foreseeable future[,]" a lack of bonding evaluation is not fatal to the Division's case. See N.J. Div. of Youth & Fam. Servs. v. B.G.S., 291 N.J. Super. 582, 593-94 (App. Div. 1996).

Defendant's inconsistent and infrequent visitation with Dawn never allowed for a bond strong enough for the court to consider under the fourth prong of the best interests test to form. Further, the court's decision was not predicated on the bond, or lack thereof, between defendant and the child, but rather it was predicated on the child's need for permanency and defendant's inability to care for the child for the foreseeable future. The trial court recognized this, stating "it's clear that termination of [appellant's] parental rights in this case will do no more harm than good. It's clear and convincing evidence termination followed by adoption . . . [will] cause much more good than any harm of terminating that right."

Finally, to the extent we have not otherwise addressed any of appellant's remaining arguments, we determine they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

20

A-2763-22