# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3451-23

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

T.A.,

     Defendant-Appellant,

and

A.D.,

     Defendant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF Z.A.,
a minor.

_____

Submitted February 10, 2025 – Decided March 11, 2025

Before Judges Gooden Brown and Chase.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Burlington County, Docket No. FG-03-0009-24.

Jennifer Nicole Sellitti, Public Defender, attorney for appellant (Beth Anne Hahn, Designated Counsel, on the briefs).

Matthew J. Platkin, Attorney General, attorney for respondent (Donna Arons, Assistant Attorney General, of counsel; Michelle J. McBrian, Deputy Attorney General, on the brief).

Jennifer Nicole Sellitti, Public Defender, Law Guardian, attorney for minor (Meredith A. Pollock, Deputy Public Defender, of counsel; Noel C. Devlin, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

Defendant T.A. ("Tanya") appeals the Family Part's final judgment terminating her parental rights to her biological child, Z.A. ("Zoe") following a five-day trial.[1] We affirm.

---

[1] We employ initials and pseudonyms to identify the parties, the children, and others to protect the children's privacy and because the records relating to Division proceedings held under Rule 5:12 are excluded from public access under Rule 1:38-3(d)(12).

I.

Zoe was born to Tanya and A.D. ("Aaron") on November 17, 2022.[2] The hospital referred the matter to the Division of Child Protection and Permanency ("Division") when both Tanya and Zoe tested positive for phencyclidine ("PCP"). Zoe did not suffer any withdrawal symptoms after birth.

Tanya had been known by the Division since 2007 when she was arrested on drug-related charges and her daughter J.A. ("Jade") had to be taken care of by a relative until Tanya was released from jail. During a 2010 Division investigation, Tanya admitted to past marijuana and cocaine use and reported being bipolar and under the care of a mental health professional. In 2013, Tanya's parental rights as to Jade were terminated, and Jade was adopted.

In August of 2020, Aaron and Tanya's first child together, P.A. ("Pearl"), was removed shortly after her birth following a positive test for PCP and opiates. Tanya admitted she had been using PCP by smoking "wet" (marijuana laced with PCP) regularly for the past eight years. In August of 2022, Tanya and Aaron's parental rights as to Pearl were terminated. Pearl was placed with her paternal aunt, A.D. ("Alice") who ultimately adopted her.

---

[2] Aaron, whose parental rights were also terminated, does not appeal.

A-3451-23

In November 2022, days after Zoe's birth, an emergency removal of Zoe occurred. The Division then filed a complaint for custody, which the court granted. Tanya sought to have Zoe placed with Alice, but Alice declined. So too did Tanya's mother, I.C. ("Ingrid"). Tanya did not provide any other possible relative resources for the Division to assess. Thus, the Division placed Zoe with G.W. ("Gloria"), a long-time friend and neighbor of Alice; Gloria was also Alice's long-term boyfriend's mother and "like a second mother to [Pearl]." Zoe has remained in Gloria's care since.

Over the years, Tanya has struggled with various programs aimed towards helping her mental health and substance abuse issues. For example, in January 2021, Tanya attended a psychological evaluation with Joseph D. Salerno, Psy.D., in which he recommended substance abuse treatment, therapy, and a psychiatric evaluation, all of which went unheeded by Tanya. Tanya did, however, attend a therapeutic visitation program, but she was hostile, aggressive, and erratic. In November 2021, the program discontinued supervised visits with Tanya. Tanya also failed to cooperate with the Division to complete an application for Division of Developmental Disabilities services—one of Dr. Salerno's additional recommendations. And for a period, Tanya even blocked the Division's phone calls.

4

In December 2022, Tanya failed to attend her substance abuse evaluation ("SAE"). That month, permanency worker Chas Keith was assigned to the case. Initially, Tanya did well with her visits, but on one occasion, Tanya insisted that she was taking Zoe home and attempted to strap her into a car seat she brought. Additionally, in 2023, Tanya tried to walk off with Zoe in a stroller, which required Keith and a security officer to follow her and try to persuade her to come back inside the building.

In February 2023, after failing to attend two previously scheduled evaluations, Tanya attended and completed a psychological evaluation with Marcia Baruch, Ph.D., to assess her parenting ability and need for services. Tanya admitted to a history of charges relating to arson and selling crack cocaine and spending five years in jail as a minor. Despite documents to the contrary, Tanya denied ever being arrested or charged with any crimes as an adult. Dr. Baruch found she was "actively psychotic" and recommended an inpatient Mental Illness Chemical Abuse ("MICA") program. Dr. Baruch also stated that if Tanya could not be placed in a MICA program, she would need a psychiatric assessment for psychosis, and then to engage in substance use treatment. She also recommended at least six months of cognitive behavioral psychotherapy. Based on Dr. Baruch's recommendation, the court ordered Tanya to attend a

MICA inpatient program. She refused, reiterating that she did not need the Division's help.

Over the next several months, Tanya's disillusionment with the Division became even greater–she told the Division to stop calling her, referred to their efforts to discuss her case as "harassment," and by April 2023 began threatening to call the police on the Division for simply trying to engage her about services and visitation. This even extended to services for Zoe, when Tanya complained that she did not have time to be harassed by Early Intervention Services calling her. As she had done during the prior litigation with Pearl, Tanya declined to attend a psychiatric evaluation, individual or group therapy, and remained unreceptive to applying for services.

By August of 2023, the Division limited Tanya's visitations of Zoe to indoor visits and spoke to her about changing the goal to adoption, which angered Tanya. When she finally allowed an assessment, Tanya denied any history of substance use and in particular, PCP; yet she tested positive for PCP that day. Tanya also denied any history of co-occurring conditions, mental health treatment, or medications. And despite Pearl and Jade both already having been adopted, she reported that her children would be returning to her care once she complied with Division-recommended services.

6

On October 3, 2023, the court approved a change of goal to termination of parental rights followed by adoption and found that the Division had made reasonable efforts to provide services to Tanya. Tanya accompanied Gloria, Alice, Pearl, and Zoe to a mall to have Zoe's ears pierced in November 2023, and that was the last time she ever saw Zoe. The Division filed its complaint for guardianship on November 29, 2023.

Though the Division still referred her to visitation programs, Tanya did not respond to their outreach. Tanya began intensive outpatient treatment ("IOP") at Creative Change Counseling ("CCC") in October 2023. But she refused to speak with her recently assigned adoption worker, Gina Cordelle, to discuss her services—so Cordelle was unaware that she started treatment—and Tanya ignored her texts and voicemails. Cordelle contacted CCC at the end of January to find out if Tanya was complying with treatment, but CCC would not disclose any information. She was later able to confirm Tanya's attendance, which the program manager reported was sometimes compromised by her medical transport. A February 2024 letter from CCC noted that Tanya was admitted to their program in October 2023 due to PCP use disorder and that she was initially "uncooperative and unpleasant." Tanya's initial drug screening reflected a "high-moderate use" of PCP and marijuana. In April 2024, Tanya

7

was unsuccessfully discharged from CCC. CCC urine screens reflected that she submitted a total of twelve urine drug screens. All of Tanya's twelve urine screens from October 2023 to March 2024 were either invalid due to concerns of adulteration or positive for marijuana, PCP, and/or alcohol.

The Division also referred Tanya to the domestic violence liaison ("DVL"), but Tanya was not responsive to their calls to initiate services. Throughout its four-year non-stop involvement with Tanya, the Division arranged family team meetings and provided bus passes and door-to-door transportation assistance for drug testing and evaluations.

The court conducted a five-day trial over two months between April 29, 2024, and June 24, 2024. The Division presented testimony from caseworkers Keith and Cordelle, as well as testimony from Alan J. Lee, Psy.D., whom the court qualified as an expert in clinical and forensic psychology. The Law Guardian presented testimony from Gregory Gambone, Ph.D., whom the court qualified as an expert in clinical psychology. Tanya testified but did not present any other evidence or witnesses.

As the permanency worker from December 2022 to October 2023, Keith testified that he saw or spoke to Tanya every week. At least twice a month he discussed with her the services she needed to comply with and the tasks she

needed to complete to work towards her goal of reunification. Tanya would become agitated when discussing services and Keith would try to deescalate the situation by explaining that he was trying to help her reunify with Zoe. Keith testified that Tanya failed to attend eight SAEs before he was finally able to convince her to attend the ninth appointment on August 25, 2023. The urine screen she submitted for the SAE was the first drug screen she was willing to complete since he started working with her in December 2022—despite "countless" requests, flexibility over dates, and offers to personally transport her to the appointments, she previously had not been willing to comply. Tanya tested positive for PCP.

Keith testified that he spoke to Gloria, who preferred to adopt Zoe to ensure she was able to keep Zoe and Pearl close and "grow up similarly," and she did not believe Tanya would be able to rectify her issues in order to care for Zoe. Despite not being interested in a Kinship Legal Guardianship ("KLG") arrangement, Gloria was willing to keep Tanya involved in Zoe's life.

As the adoption worker, Cordelle took over the case from October 2023 through trial. Beyond the positive urine screens she completed through CCC, Tanya never complied with any of the monthly, court-ordered urine screens the

Division arranged. Tanya completely rebuffed the last attempt to engage with her in May 2024, telling Cordelle "[n]ot to talk to her."

Cordelle testified that the Division assessed Alice and Ingrid as placement resources, but neither was willing and no other relatives were named or identified as placement options. Cordelle, however, witnessed the affectionate relationship between Gloria and Zoe and highlighted that Zoe gets to see her extensive paternal family in addition to Pearl; Alice and Gloria even babysit for one another and Pearl refers to Gloria as "Nana." Cordelle discussed KLG and adoption with Gloria and provided her with information regarding the differences between the two. Gloria wanted to adopt Zoe. The Division had no concerns regarding Gloria's care of Zoe.

On March 6 and April 25, 2024, Dr. Gambone completed a bonding evaluation of Zoe with Gloria. Dr. Gambone did not evaluate Tanya as she refused to attend the evaluation and did not seek to have it rescheduled. Dr. Gambone found that Zoe had "a very strong positive attachment" to Gloria, who serves as "the principle [sic] psychological function of mother for [her] . . . ." Noting that Zoe spent all but six days of her entire life in Gloria's care, he found that if she were separated it would likely cause "lasting psychological effects" which "would not be mitigated simply by placement with . . . a [biological]

10

parent" even if "augmented by mental health services." Dr. Gambone opined that "the combination of a strong, positive, and consistent attachment, along with an enduring cognitive, emotional, and social dependence on [Gloria], suggests that terminating the relationship . . . will likely cause lasting psychological dysfunction resulting in permanent emotional, cognitive or social impairments."

Dr. Gambone explained that PCP use has "long-term and short-term effects that mimic psychotic functions, psychosis" and thus, the recommendations in Tanya's February 2023 evaluation—to be reevaluated after completing substance use treatment, followed by six months of abstinence and "an absence of psychosis" along with "a commitment to and progress in psychotherapy"—were reasonable. Dr. Gambone explained that PCP "either creates psychotic functions or it exacerbates existing psychotic functions." These psychotic functions present as "disorganized thought" and "impulsivity to very poor decision making because of the disorganized thought," which could cause a user to react to "internal stimuli" such as hearing "voices, seeing things, conspiracies, paranoia" or present with "erratic behavior" and "impulsive aggression." Based on his experience working with PCP users, he noted that the longer a person uses PCP, "the more likely" they will have "lasting" or even "permanent" effects even after they stop using. Dr. Gambone supported a plan

11

of adoption for Zoe by her current caregiver—noting that Gloria is "the optimal permanent guardian" and that he did not "think there's a better choice."

Though Dr. Lee psychologically evaluated Aaron, he never evaluated Tanya because she refused to attend the appointment and never sought it to be rescheduled.[3]  Dr. Lee generally explained that the concept of permanency is important as the components of permanency:  "consistency and stability" allow a child "to progress through her development emotionally, physically, academically, socially, behaviorally."  Without permanency, a child is "left with uncertainty" including "whom she can count on for daily care as to where she will call home."

Tanya's attorney led her through an extensive direct examination, allowing her to present her version of events and try to demonstrate not only that she had made substantial changes since the court terminated her parental rights to Pearl, but also that she was willing to engage in additional services beyond substance abuse treatment.  Tanya's attorney questioned her in such a manner as to present context for why she did not visit and to persuade the court visits with Zoe went well before Tanya stopped attending.  He eventually was

---

[3]  Because Aaron has not appealed, we will not recount Dr. Lee's findings in this regard.

able to get her to affirm that she was willing to attend and successfully complete the services necessary for her to parent Zoe. During cross-examination, Tanya admitted to using PCP and drinking alcohol while pregnant with Zoe. But she refused to answer questions about when she last used, replying, "I would like to pass . . . ."

Following the presentation of evidence, the court issued an oral opinion accepting the testimony of DCPP caseworkers Keith and Cordelle as credible. Dr. Lee and Dr. Gambone were accepted as experts by the court. Additionally, the court found that both doctors were credible. In contrast, for Tanya, the court stated it "did not find [her] credible. She was emotional and she got very agitated while she was testifying." Further, "[h]er answers were vague and had little specifics, such as stating that she was a different person now without stating how."

The court concluded that DCPP proved all four prongs of N.J.S.A. 30:4C-15.1(a) by clear and convincing evidence and issued an order terminating Tanya's parental rights. This appeal followed.

II.

Our scope of appellate review is limited. It is well established in Title 30 cases we will not second-guess or substitute our judgment for that of the family

court, provided its factual findings are "grounded in substantial and credible evidence in the record." N.J. Div. of Child Prot. & Permanency v. D.C.A., 256 N.J. 4, 19 (2023). "Deference is especially appropriate 'when the evidence is largely testimonial and involves questions of credibility.'" Cesare v. Cesare, 154 N.J. 394, 412 (1998) (quoting In re Return of Weapons to J.W.D., 149 N.J. 108, 117 (1997)). "We accord deference to fact[-]findings of the family court because it has the superior ability to gauge the credibility of the witnesses who testify before it and because it possesses special expertise in matters related to the family." N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 448 (2012). "[A] trial court's factual findings 'should not be disturbed unless they are so wholly unsupportable as to result in a denial of justice.'" N.J. Div. of Youth & Fam. Servs. v. P.P., 180 N.J. 494, 511 (2004) (quoting In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002)). We owe no deference to a judge's legal conclusions which are reviewed de novo. N.J. Div. of Child Prot. & Permanency v. A.B., 231 N.J. 354, 369 (2017).

The applicable law is clear. In considering whether to terminate parental rights, the trial court applies the statutory best interests test, which requires consideration of the following four prongs:

(1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;

(2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm;

(3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

[N.J.S.A. 30:4C-15.1(a).]

The Division must prove each prong by "clear and convincing evidence." N.J. Div. of Child Prot. & Permanency v. D.H., 469 N.J. Super. 107, 115 (App. Div. 2021). These prongs are not discrete and separate; they overlap to inform a more general inquiry that the termination of parental rights is in a child's best interests. N.J. Div. of Child Prot. & Permanency v. R.L.M., 236 N.J. 123, 145 (2018). "'The question ultimately is not whether a biological mother or father is a worthy parent, but whether a child's interest will best be served by completely terminating the child's relationship with that parent.'" N.J. Div. of Youth & Fam. Servs. v. T.S., 417 N.J. Super. 228, 249 (App. Div. 2010) (quoting

N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 108 (2008)). "'[P]arental fitness is the key to determining the best interests of the child.'" N.J. Div. of Youth & Fam. Servs. v. I.S., 202 N.J. 145, 170 (2010) (quoting In re Guardianship of K.H.O., 161 N.J. 337, 348 (1999)).

"Parents have a constitutionally protected right to maintain a relationship with their children." N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 279 (2007). That right, however, "is not absolute" and is limited "by the State's parens patriae responsibility to protect children whose vulnerable lives or psychological well-being may have been harmed or may be seriously endangered by a neglectful or abusive parent." F.M., 211 N.J. at 447. In guardianship and adoption cases, such as here, it is well-established that "[c]hildren have their own rights, including the right to a permanent, safe[,] and stable placement." N.J. Div. of Youth & Fam. Servs. v. C.S., 367 N.J. Super. 76, 111 (App. Div. 2004). We acknowledge "the need for permanency of placements by placing limits on the time for a birth parent to correct conditions in anticipation of reuniting with the child." Ibid. Thus, a parent's interest must, at times, yield to the State's obligation to protect children from harm. See N.J. Div. of Youth & Fam. Servs. v. G.M., 198 N.J. 382, 397 (2009).

A-3451-23

After carefully reviewing Tanya's arguments considering the record and applicable legal principles, we are convinced there is no basis to disturb the trial judge's well-reasoned decision that DCPP established by clear and convincing evidence that termination of her parental rights to Zoe was warranted. The trial court's credibility findings were based on substantial evidence in the record. We address only prongs three and four and rely upon the trial court's findings and legal conclusions regarding all four prongs. We also address Tanya's claims of ineffective assistance of counsel.

A.

With respect to the third prong, Tanya argues the Division did not demonstrate its reasonable efforts to provide her with services. Moreover, she posits that DCPP did not meet its burden of proving that the resource parents are committed unconditionally to adoption.

The third prong requires the Division to undertake "reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home" and requires the court to consider "alternatives to termination of parental rights." N.J.S.A. 30:4C-15.1(a)(3).

"Reasonable efforts" include, but are not limited to:

(1) consultation and cooperation with the parent in developing a plan for appropriate services;

(2) providing services that have been agreed upon, to the family, in order to further the goal of family reunification;

(3) informing the parent at appropriate intervals of the child's progress, development, and health; and

(4) facilitating appropriate visitation.

[N.J.S.A. 30:4C-15.1(c).]

Courts do not measure reasonableness by the "success" of the efforts. N.J. Div. of Youth & Fam. Servs. v. J.S., 433 N.J. Super. 69, 90 (App. Div. 2013) (quoting D.M.H., 161 N.J. at 393). What is reasonable "depend[s] on the facts and circumstances of each case." N.J. Div. of Child Prot. & Permanency v. R.G., 217 N.J. 527, 557 (2014).

The record is replete with evidence of the Division offering multiple services, in multiple ways, and on multiple occasions, to help correct Tanya's substance abuse addiction and mental health issues. The court specifically found the Division not only offered visitation services to Tanya, but also offered transportation and bus passes for visitation and urine screens. The court also determined Tanya was scheduled by the Division for psychological evaluations but failed to go. Additionally, the court concluded Tanya was offered

counseling, therapy, bonding evaluations, and other services but either did not go or started to go but was terminated for lack of attendance.

This prong also requires the court to consider alternatives to the termination of parental rights. N.J.S.A. 30:4C-12.1. The statute "does not permit the Division to embark on a course set for termination of parental rights and adoption by a foster parent without at least first exploring available relative placements." N.J. Div. of Youth & Family Servs. v. K.L.W., 419 N.J. Super. 568, 580 (App. Div. 2011).

Here, the court's finding that the third prong was satisfied was supported by significant evidence in the record. The record supports the court's conclusion that throughout this matter, the Division assessed multiple other placements before placing the child with the resource parent. Also, the Division discussed KLG versus adoption with the resource parent who was committed to adoption as she believed it was in the child's best interest. The court's finding as to the third prong is amply supported by the record.

B.

The fourth prong of the best interests test "serves as a fail-safe against termination even where the remaining standards have been met." E.P., 196 N.J. at 108. "The question ultimately is not whether a biological mother or father is

19

a worthy parent, but whether a child's interest will best be served by completely terminating the child's relationship with that parent." Ibid. The question to be addressed "is whether, after considering and balancing the two relationships, the child will suffer a greater harm from the termination of ties with her natural parents than from the permanent disruption of her relationship with her foster parents." K.H.O., 161 N.J. at 355 (1999). In making that determination under the fourth prong, the court may consider evidence regarding the bond between the child and the resource parents. See D.C.A., 256 N.J. at 28 (holding the 2021 amendment to N.J.S.A. 30:4C-15.1(a) "precludes a court from considering the bond between a child and resource parents under the second prong of the best interests standard but does not bar such evidence when the court addresses that standard's fourth prong").

"[A] child's need for permanency is an extremely important consideration pursuant to this prong." R.G., 217 N.J. at 559. "[A] child has a right to live in a stable, nurturing environment and to have the psychological security that his most deeply formed attachments will not be shattered." F.M., 211 N.J. at 453. But "[k]eeping the child in limbo, hoping for some long[-]term unification plan, would be a misapplication of the law." N.J. Div. of Youth & Fam. Servs. v. A.G., 344 N.J. Super. 418, 438 (App. Div. 2001).

Here, the court found the termination of parental rights would not do more harm than good. The court considered that all Zoe has ever known was her resource parent and that Tanya had not seen her in over six months. Based on Zoe's age, overall health, and development, the court concluded her best interests would be best served by a stable and safe home where her emotional and physical needs would continue to be met. In support of this finding, the court credited Dr. Gomez's testimony that Zoe was securely bonded to the resource parent. The court also credited his concern that Tanya refused to go to her evaluation with Dr. Gambone. The court gave weight to Tanya's refusal to attend visits with Zoe and thus it determined that she did not try and foster a relationship with her child. Therefore, the court concluded termination of Tanya's relationship would not harm Zoe. The record is substantial that Zoe needed permanency, and the resource parent offered it while Tanya did not.

C.

A defendant in a parental-rights-termination case has a constitutional right to effective counsel. N.J. Div. of Youth & Fam. Servs. v. B.R., 192 N.J. 301, 306 (2007). To establish an ineffective-assistance-of-counsel claim in a parental-rights-termination case, a defendant must meet the two-prong test established in Strickland v. Washington, 466 U.S. 668, 687 (1984), and adopted

21

in State v. Fritz, 105 N.J. 42 (1987). The test requires the defendant show trial counsel's performance was deficient and that, but for the deficient performance, the result would have been different. B.R., 192 N.J. at 307-09. A court reviews the claim under "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance"; the defendant must overcome the presumption that the challenged action was part of a "sound trial strategy." Strickland, 466 U.S. at 689 (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)); see also B.R., 192 N.J. at 307-08.

Tanya contends the trial court's erroneous decision resulted from the ineffective assistance of her trial counsel. Tanya takes issue with what she describes as counsel harassing her. She cites to a passage in which she tells the attorney to do his job and let the judge do her job. While this back-and-forth between Tanya and her attorney may seem inappropriate, within the larger context of her testimony, trial counsel was directing Tanya to answer his questions and was trying to elicit testimony from her in which she both acknowledged her substance abuse issues and testified she was willing to complete treatment.

Further, regarding the two Strickland prongs, Tanya cannot meet either prong. Focusing solely on the second prong in which there must be a showing

that the results would have been different, as stated in <u>B.R.</u>, if we determine on the basis of the full record that the outcome of the trial would not have changed, the analysis ends. 192 N.J. at 311. Here, the evidence supports the determination that the outcome would not have changed. The court found that the witnesses presented by the State were credible and determined Tanya was not a credible witness. Based on the court's credibility findings, the court accurately concluded that termination of parental rights was appropriate. Tanya has not offered any evidence, other than counsel's purported strategy errors, that the outcome would have been different.

To the extent we have not otherwise addressed any of appellant's remaining arguments, we determine they lack sufficient merit to warrant discussion in a written opinion. <u>R.</u> 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Harley*

Clerk of the Appellate Division

23                                                              A-3451-23